**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

TABOOLA, INC.,

                       Plaintiff,

    -against-

EZOIC INC. and DWAYNE LAFLEUR,

                      Defendants.

**AMENDED COMPLAINT**

17-cv-09909-RWS

       Plaintiff Taboola, Inc. ("Plaintiff"), by and through its attorneys, Sher Tremonte LLP, as and for its Amended Complaint against Defendants Ezoic Inc. ("Ezoic") and Dwayne Lafleur ("Lafleur"), alleges as follows:

**PRELIMINARY STATEMENT**

       1.     This is an action for damages and injunctive relief arising from Ezoic's tortious interference with Plaintiff's contractual relationships with its business partners.  Ezoic has knowingly and willfully advised and instructed at least four of Plaintiff's publisher business partners (the "Publishers," each specified below in Paragraph 16) to breach written contracts requiring the Publishers to display Plaintiff's Internet advertising and content recommendation technology on their websites.  Making matters worse, Ezoic has taken active measures to block Plaintiff's technology from appearing on the Publishers' websites, forcing these Publishers into a breach of their agreements with Plaintiff.

       2.     In the course of their interference with Plaintiff's business relationships, Defendants have also breached their own contract with Plaintiff.  Defendants have breached this contract by (1) failing to display Plaintiff's Internet advertising and content recommendation

technology on their own website; (2) disparaging Plaintiff in violation of an enforceable non-disparagement clause; and (3) breaching the contractual prohibition against blocking or bypassing Plaintiff's technology.

3.     Because Ezoic has targeted at least four of Plaintiff's Publishers to date, and because Ezoic's ongoing misconduct is causing irreparable harm to Plaintiff's business relationships, Plaintiff seeks injunctive relief as well as monetary damages.

## PARTIES

4.     Plaintiff Taboola is a corporation organized under the laws of the State of Delaware that has its principal place of business at 1115 Broadway, 7th Floor, New York, New York 10010.

5.     Defendant Ezoic is a Nevada corporation with its principal place of business at 2542 Gateway Road, Carlsbad, California 92009.

6.     Defendant Dwayne Lafleur is an individual residing at 2446 Mica Rd., Carlsbad, California.  Lafleur is the Founder and CEO of Ezoic.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Plaintiff and Defendants, and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

8.     This Court has personal jurisdiction over Defendants for at least the following reasons:  (1) Defendants have contractually submitted to the jurisdiction of the federal courts in New York in their contract with Plaintiff; (2) there is jurisdiction under CPLR § 302(a)(1) because Defendants have transacted business in New York and contracted to supply goods or services in New York and Plaintiff's claims arise out of these transactions and contracts; and (3) there is

jurisdiction under CPLR § 302(a)(3) because Defendants have committed tortious acts outside of New York causing injury in New York.

9.      Personal jurisdiction is warranted under CPLR § 302(a)(1) because Defendants purposefully signed and repeatedly renewed a contract with Plaintiff, governed by New York law and subject to enforcement in New York, to provide services in New York to Plaintiff, a New York based entity, and the claims in this Amended Complaint arise from that relationship.

10.     Personal jurisdiction is warranted under CPLR § 302(a)(3) because Defendants have committed tortious acts causing injury to Taboola within New York.  Defendants regularly do or solicit business in New York or derive substantial revenue from goods used or consumed or services rendered in New York.  Defendants expected or should have reasonably expected their acts of tortious interference with Taboola's contracts act to have consequences in New York, where they knew Taboola was based.  Defendants derive substantial revenue from interstate or international commerce.

11.     Venue is proper in the Southern District of New York under 28 U.S.C. § 1391, because this is a district in which a substantial part of the events or omissions giving rise to the claims occurred and this is a district in which Defendants are subject to personal jurisdiction.

## FACTUAL ALLEGATIONS

### Plaintiff's Business Model

12.     Plaintiff is one of the world's leading targeted digital advertising technology companies.  Its content recommendation technology (the "Content Discovery Platform", also referred to in Plaintiff's agreements as the "Widget") reaches more than one billion Internet users and offers more than 360 billion recommendations each month.

13.     Plaintiff enters into agreements with Internet publishers, such as CBS, NBC, USA Today, and The Weather Channel, to be the exclusive provider of content recommendations that help monetize the websites and digital properties that these publishers own and/or operate.

14.     Plaintiff provides code for its proprietary Content Discovery Platform technology, which publishers place on their websites and digital properties.  The Content Discovery Platform then appears on the publisher's websites, typically below the header (*e.g.*, "Content You May Like," "Recommended for You," or "Around the Web") and recommends sponsored articles and advertisements ("Content," referred to in the agreements as the "Taboola Sponsored Content") to each visitor of the websites, based upon that visitor's particular interests (collectively, the "Recommendations").  Content may be provided by a sponsoring advertiser, third-party publisher, or by the publisher itself for the promotion of its own editorial content.

15.     When a visitor clicks on a Recommendation, the visitor is directed away from the publisher's website to the website of the third party that paid for the distribution of the recommended Content.  This sponsoring third party pays Plaintiff a contractually-specified sum, called a Cost Per Click, each time a visitor clicks on its Content link.  Plaintiff then pays the publisher a percentage of Plaintiff's revenues from each click pursuant to a contractually specified formula.

**Plaintiff's Contracts with the Publishers**

16.     Julio Garcia Network ("JGN"), Swing by Swing Golf, Inc. ("SwingxSwing"), Precision Creations, LLC ("Precision Creations"), and TechSoft IT Solutions ("TechSoft") are among the publishers with whom Plaintiff does business pursuant to written contract.  These four publishers are referred to in this Complaint as "the Publishers."

4

17.    Plaintiff's contracts with each of the Publishers (the "Publisher Agreements") require the Publishers to display Plaintiff's Content Discovery Platform on the Publishers' websites throughout the term of the contract.

18.    The terms of the Publisher Agreements are substantially identical to the terms of the Defendants' contract with Plaintiff.  They are also substantially identical to the "Publisher Terms and Conditions" that have been publically listed on Taboola's website throughout all timeframes at issue in this Amended Complaint.[1]

**Ezoic's Business**

19.    Ezoic provides an Internet advertisement testing platform for its customers.  Ezoic's customers download Ezoic's web browser extension, which allows them to test different combinations of advertisement placement locations and sizes for their websites.  Ezoic then recommends ways that its customers can optimize ad revenue and user experience.

20.    According to Ezoic's website, Ezoic has over 30,000 sites registered to its platform with over half a billion visitors per day.  Ezoic has multiple offices in California and in the United Kingdom.  Ezoic provides services through its Internet advertisement testing platform to numerous customers based in New York from which it derives substantial revenue.  Ezoic's customers are located worldwide and Ezoic derives substantial revenue from interstate and international commerce.

21.    Ezoic's form Affiliate Agreement contract, publicly available on its website, is expressly governed by the laws of the state of New York.

---

[1]       A version of the Publisher Terms and Conditions are publicly viewable here:
https://www.taboola.com/publisher-revshare-terms-and-conditions-1.3-US

**Defendants Tortiously Interfere with the Publisher Agreements**

22.     Beginning no later than March 2017, Ezoic has advised, encouraged, and instructed at least four of Plaintiff's Publishers to breach their contracts with Plaintiff by removing Plaintiff's Content Discovery Platform from their websites.  Ezoic has done this with full knowledge that removing Plaintiff's Content Discovery Platform would constitute a breach of the Publishers' contractual obligations.

*JGN*

23.     JGN entered into a publisher agreement with Taboola dated June 7, 2016 (the "JGN Agreement").

24.     The key material terms of the JGN Agreement are that (1) JGN will display Taboola's Content Discovery Platform on its websites, a-tamashi.net and mundo-kpop.info, throughout the contractual term; and (2) Taboola and JGN will share the revenues that Taboola receives from third party websites to which viewers are redirected after clicking on a Recommendation on JGN's websites, pursuant to a specified contractual formula.

25.     Throughout the term of the JGN Agreement, JGN is required to display Taboola's Content Discovery Platform on its websites.

26.     Throughout the term of the JGN Agreement, JGN is prohibited from using content recommendation technologies belonging to Taboola's competitors on its websites.  The JGN Agreement specifically names Outbrain as a competitor of Taboola.

27.     The JGN Agreement will not expire until June 2018 at the earliest.  This is because the original term of the contract was for one year beginning on June 7, 2016.  On June 7, 2017, the JGN Agreement was renewed for an additional one year term, lasting through June 7, 2018.

28.     JGN is one of Plaintiff's publishers that uses Ezoic's services.

29.     Upon information and belief, JGN discussed the material terms of the JGN Agreement with Ezoic, including but not limited to the requirement that JGN display Taboola's Content Discovery Platform on its websites throughout the contractual term.

30.     In late April 2017, Plaintiff noticed that the code for its Content Discovery Platform was no longer appearing on JGN's websites.  In its place, content recommendations from Outbrain, one of Plaintiff's main competitors, appeared on JGN's website instead.  This constituted a clear violation of the contract between Plaintiff and JGN.

31.     When Plaintiff asked JGN why it was no longer displaying Plaintiff's Content Discovery Platform, JGN responded that it was using Ezoic's services, and that Ezoic had deliberately configured its ad tester platform to prevent Plaintiff's Content Discovery Platform from displaying.  Ezoic had suggested to JGN that it run ads from Outbrain instead of Plaintiff, which JGN agreed to do.

32.     On May 15, 2017, JGN forwarded Plaintiff an email that it had received from Ezoic, which read in relevant part:

> Taboola is no longer allowed to run alongside Ezoic products. We've noticed Taboola has been randomly injecting ads which our system is not able to track as part of the tests; causing a bad user experience.  Since they interfere with Ezoic, Taboola will not show when Ezoic is turned On. If you would like to consider running native ads on Ezoic versions, we could run Outbrain ads for you in their place. Would you be open to this?

33.     Ezoic had actual knowledge of the JGN Agreement, including specific knowledge of the requirement that JGN display Taboola's Content Discovery Platform on its website throughout the contractual term.  Ezoic has actual knowledge that the JGN Agreement remains in effect.

34.     Ezoic directly and intentionally caused JGN to breach the JGN Agreement by preventing Taboola's Content Discovery Platform from displaying on JGN's websites.  JGN would not have breached the JGN Agreement but for Ezoic's tortious interference.

35.     Ezoic directly and intentionally caused a further breach of the JGN Agreement by successfully urging and persuading JGN to run content recommendations from Outbrain instead of Plaintiff.  To date, JGN's websites are displaying content recommendations from Plaintiff's competitors instead of Plaintiff in violation of the JGN Agreement.

36.     To this day, Ezoic is continuously interfering with the JGN Agreement by intentionally blocking Taboola's Content Discovery Platform from rendering on JGN's website.

*SwingxSwing*

37.     SwingxSwing entered into a publisher agreement with Taboola dated April 23, 2014 (the "SwingxSwing Agreement.").

38.     The key material terms of the SwingxSwing Agreement are that (1) SwingxSwing will display Taboola's Content Discovery Platform on its website, back9network.com, throughout the contractual term; and (2) Taboola and SwingxSwing will share the revenues that Taboola receives from third party websites to which viewers are redirected after clicking on a Recommendation on SwingxSwing's website, pursuant to a specified contractual formula.  Upon information and belief, SwingxSwing discussed these material terms with Ezoic.

39.     Throughout the term of the SwingxSwing Agreement, SwingxSwing is required to display Taboola's Content Discovery Platform on its websites.

40.     Throughout the term of the SwingxSwing Agreement, SwingxSwing is prohibited from using content recommendation technologies belonging to Taboola's competitors, expressly including Outbrain.

8

41.    The SwingxSwing Agreement remained in effect until April 23, 2018.  This is because the original term of the contract was for one year beginning on April 23, 2014 and was renewed for an additional year in 2015, 2016, and 2017.

42.    SwingxSwing was another of Plaintiff's publishers that uses Ezoic's services.

43.    Upon information and belief, SwingxSwing discussed the material terms of the SwingxSwing Agreement with Ezoic, including but not limited to the requirement that SwingxSwing display Taboola's Content Discovery Platform on its website throughout the contractual term.

44.    SwingxSwing breached the SwingxSwing Agreement by removing Plaintiff's Content Discovery Platform from its website on March 17, 2017.

45.    In or around early 2017, purportedly to enable it to "optimize performance" on SwingxSwing's websites, Ezoic requested that Plaintiff provide it with proprietary and confidential information showing where Plaintiff displays specific advertisers across its entire network of publishers.   In the interests of protecting the privacy of its business partners and keeping Plaintiff's own proprietary information out of the hands of competitors, Plaintiff reasonably refused to provide this information.

46.    Thereafter, on March 17, 2017, the CEO of SwingxSwing, Charles Cox ("Cox") informed Plaintiff that it had decided to stop using Plaintiff as the result of a recommendation from Ezoic.  Cox explained that SwingxSwing did not wish to display Plaintiff's Content Discovery Platform – as it was contractually required to do – because it would prevent Ezoic from testing whether displaying other ads in that same space would be more profitable.

47.    This email from Cox read, in relevant part:

After lengthy discussions with our banner advertising consultant & partner, Ezoic, we have decided to stop using Taboola as a source of advertising for

the next few weeks.  Ezoic and its software's algorithm optimize where and when we show any banner / video advertising of any kind on our desktop and mobile website.  Unfortunately, giving Taboola the space we currently do today does not allow us to test whether Taboola native ads are additive or dilutive relative to what we could get via other sources, and we need to allow Ezoic to test all of its advertiser sources from Google and other partners, using header bidding and other tactics.

48.    In a later related email, dated April 4, 2017, Cox informed Plaintiff that it had "handed all inventory over to Ezoic" and that Ezoic is "testing our inventory with its own certified partners."

49.    At or around the time of these emails, SwingxSwing removed Plaintiff's Content Discovery Platform from its websites and began running content recommendations from Outbrain instead.  Upon information and belief, Plaintiff's competitor Outbrain is one of the "certified partners" of Ezoic referenced by Cox.

50.    SwingxSwing's replacement of Plaintiff's Content Discovery Platform with Outbrain's competing content recommendation technology constituted an ongoing breach of SwingxSwing's contract with Plaintiff through April 23, 2018.

51.    On June 7, 2017, SwingxSwing sent a letter to Plaintiff, impermissibly seeking to terminate its contract with Plaintiff ten months early.  In this letter, SwingxSwing notes that it has "engaged a consultant [Ezoic] to advise it" regarding Plaintiff's services.  As a purported justification for its termination, SwingxSwing claims that Ezoic cannot "test new ad types and locations" due to Plaintiff's unwillingness to share proprietary information with Ezoic.

52.    Were it not for Ezoic's recommendations, SwingxSwing would not have breached its contract with Plaintiff.

53.    Ezoic had actual knowledge of the SwingxSwing Agreement, including specific knowledge of the requirement that SwingxSwing display Taboola's Content Discovery Platform

on its website throughout the contractual term.  Ezoic had actual knowledge that the SwingxSwing Agreement remained in effect through April 23, 2018.

54.     Ezoic has continued to tortiously interfere with the SwingxSwing Agreement throughout the duration of the contract's term by urging SwingxSwing not to display the Content Discovery Platform (as it is required to do under the terms of the contract) and by intentionally preventing the Content Discovery Platform from rendering on SwingxSwing's website.

*Precision Creations*

55.     Precision Creations entered into a publisher agreement with Taboola dated January 1, 2015 (the "Precision Creations Agreement.").

56.     The key material terms of the Precision Creations Agreement are that (1) Precision Creations will display Taboola's Content Discovery Platform on its website, fascinately.com, throughout the contractual term; and (2)  Taboola and Precision Creations will share the revenues that Taboola receives from third party websites to which viewers are redirected after clicking on a Recommendation on Precision Creation's website, pursuant to a specified contractual formula. Upon information and belief, Precision Creations discussed these material terms with Ezoic.

57.     Throughout the term of the Precision Creations Agreement, Precision Creations is required to display Taboola's Content Discovery Platform on its website.

58.     The Precision Creations Agreement will not expire until January 1, 2019 at the earliest.  This is because the original term of the contract was for one year beginning on January 1, 2015 and was renewed for additional one year terms in 2016, 2017, and 2018.

59.     On June 1, 2017, Plaintiff's Content Discovery Platform was removed from Precision Creations' website, in breach of the Precision Creations Agreement.

60.     Precision Creations uses Ezoic's ad testing platform.

61.    Upon information and belief, Precision Creations discussed the material terms of the Precision Creations Agreement with Ezoic, including but not limited to the requirement that Precision Creations display Taboola's Content Discovery Platform on its website throughout the contractual term.

62.    On June 8, 2017, in response to Plaintiff's inquiry regarding why the Content Discovery Platform was not being displayed, Joshua Wychopen ("Wychopen"), the CEO of Precision Creations, informed Plaintiff that Ezoic had purposely blocked Plaintiff's Content Discovery Platform from appearing on Precision Creations' websites.

63.    This email from Wychopen read, in relevant part: "We reached out to the Ezoic support team and they said this, 'We found a few instances where Taboola was randomly injecting ads on the page and it was interfering with our system so *we have to automatically remove it*.'" (emphasis added).

64.    Wychopen's email demonstrates that Ezoic is not only telling Plaintiff's business partners not to work with Plaintiff in breach of their contracts, but is actually forcing such breaches by implementing code which "removes" Plaintiff's Content Discovery Platform so that Ezoic can run its purported tests.  Moreover, Ezoic's statement that Taboola "was randomly injecting ads on the page" was baseless and false.

65.    Ezoic had actual knowledge of the Precision Creations Agreement, including specific knowledge of the requirement that Precision Creations display Taboola's Content Discovery Platform on its website throughout the contractual term.  Ezoic had actual knowledge that the Precision Creations Agreement remained in effect as of June 1, 2018.

66.    Ezoic procured a breach of the Precision Creations Agreement by intentionally removing Taboola's Content Discovery Platform from Precision Creations' website.    Precision

12

Creations would not have breached the Precision Creations Agreement but for Ezoic's tortious interference.

*TechSoft*

67.     TechSoft entered into a publisher agreement with Taboola dated June 1, 2010 (the "TechSoft Agreement.").

68.     The key material terms of the TechSoft Agreement are that (1) TechSoft will display Taboola's Content Discovery Platform on its websites, viralityvideos.com, niquevideos.net, uniquefacts.net, amazetify.com, amaznginfo.com, philnews.ph, trendyfacts.com, throughout the contractual term; and (2)  Taboola and TechSoft will share the revenues that Taboola receives from third party websites to which viewers are redirected after clicking on a Recommendation on TechSoft's websites, pursuant to a specified contractual formula.

69.     Throughout the term of the TechSoft Agreement, TechSoft is required to display Taboola's Content Discovery Platform on its websites.

70.     Throughout the term of the TechSoft Agreement, TechSoft is prohibited from using content recommendation technologies belonging to Taboola's competitors.

71.     The TechSoft Agreement will not expire until June 1, 2018 at the earliest.  This is because the original term of the contract was for one year beginning on June 1, 2010 and was renewed for additional one year terms in 2011, 2012, 2013, 2014, 2015, 2016, and 2017.

72.     In emails from May-July 2017, TechSoft informed Plaintiff that it would not run Plaintiff's Content Discovery Platform on its website philnews.ph at various times because it wished to run Ezoic's ad testing platform instead.

73.     Upon information and belief, TechSoft discussed the material terms of TechSoft Agreement with Ezoic, including but not limited to the requirement that TechSoft display Taboola's Content Discovery Platform on its website throughout the contractual term.

74.     TechSoft breached the TechSoft Agreement from May 6 - May 29, 2017 and again from May 30 - August 3, 2017 by removing Plaintiff's Content Discovery Platform from philnews.ph.

75.     TechSoft's actions constituted a breach of its contract with Plaintiff, because it is required to run Plaintiff's Content Discovery Platform at all times on philnews.ph throughout the term of its contract, which is ongoing.

76.     Ezoic had actual knowledge of the TechSoft Agreement, including specific knowledge of the requirement that TechSoft display Taboola's Content Discovery Platform on its website throughout the contractual term.  Ezoic had actual knowledge that the TechSoft Agreement Agreement remained in effect from May 6 - May 29, 2017 and again from May 30 - August 3, 2017.

77.     Upon information and belief, Ezoic tortiously interfered with the TechSoft Agreement by advising and instructing TechSoft to breach its contract with Plaintiff and by removing the Content Discovery Platform from philnews.ph.  TechSoft would not have breached the TechSoft Agreement but for Ezoic's tortious interference.

**Defendants Breach Their Own Contract with Plaintiff**

78.     On or around August 12, 2014, Plaintiff entered into a standard publisher agreement with Ezoic and Lafleur (the "Ezoic Agreement"), which is substantially identical to Taboola's other publisher agreements, including but not limited to the Publisher Agreements.

79.     At the time the Ezoic Agreement was executed, Defendants were aware that Taboola is based in New York and that the Ezoic Agreement was governed by New York law and subject to enforcement in New York courts.

80.     The key material terms of the Ezoic Agreement are that (1) Ezoic will display Taboola's Content Discovery Platform on its website, internetslang.com, throughout the contractual term; and (2) Taboola and Ezoic will share the revenues that Taboola receives from third party websites to which viewers are redirected after clicking on a Recommendation on Ezoic's website, pursuant to a specified contractual formula.

81.     Throughout the term of the Ezoic Agreement, Ezoic is required to display Taboola's Content Discovery Platform on its website.

82.     Throughout the term of the Ezoic Agreement, Ezoic is prohibited from using content recommendation technologies belonging to Taboola's competitors.  The Ezoic Agreement specifically names Outbrain as a competitor of Taboola.

83.      The Ezoic Agreement was terminated by Defendants at the end of the term of its second renewal period, effective August 12, 2017.  It remained in full effect up until that date.  The original term of the Ezoic Agreement was for one year beginning on August 12, 2014 and was renewed for additional one year terms in 2015 and 2016.

84.     The Ezoic Agreement was entered into by Lafleur both individually and on behalf of Ezoic.

85.     The Ezoic Agreement requires Defendants to display the Content Discovery Platform throughout the term of the Agreement and prohibits Defendants from using competing content recommendation technology.  Accordingly, Defendants have been aware since 2014 that Plaintiff has these requirements in its standardized publisher agreements.

86.     Defendants have breached the Ezoic Agreement by failing to display the Content Discovery Platform on their website, internetslang.com.   Defendants stopped displaying the Content Discovery Platform in October 2014.   Accordingly, Defendants were in breach of the Ezoic Agreement from October 2014 until the contract's termination in August 2017.   Defendants' breach caused Plaintiff to lose advertising revenue that it otherwise would have received through Defendants' website.

87.     The Ezoic Agreement, at Paragraph 2, also contains a material non-disparagement clause (the "Non-Disparagement Clause") that prohibits Defendants from engaging "in any action or practice that disparages or devalues Plaintiff, the Widget, the Taboola Sponsored Content, or the reliability, reputation or goodwill of any of them."

88.     Paragraph 2 of the Ezoic Agreement also contains a material clause (the "No Modification Clause") that provides that Defendants cannot: "modify, change, edit, amend, truncate, alter, bypass or reorder any aspect of [Taboola's] Widget or Recommendations."   This clause prohibits modifying or bypassing the Widget on either Ezoic's own website or on any other website.

89.     Paragraph 2 of the Ezoic Agreement, which contains the Non-Disparagement Clause and the No Modification Clause, reads, in its entirety:

> Acceptable Use Policy: Publisher agrees that it will not, either by itself or by authorizing or encouraging others to do so, directly or indirectly: (a) use, post or promote the Widget or any Recommendations in association with any material or content which is, or which may be reasonably considered to be illegal, unlawful or infringing under any applicable laws, pornographic, obscene, promotional of illicit drugs and drug paraphernalia, gambling‑related, weapon or ammunition‑related, violent, libelous, defamatory, indecent, seditious, offensive, invasive to privacy, abusive, threatening, harmful, vulgar, possibly capable of inciting racial hatred, discriminatory (racially, ethnically or otherwise), in breach of confidence or any other right of any third party, or lacking in necessary authorizations, approvals, consents or licenses; (b) ***engage in any action or practice that disparages***

*or devalues Taboola, the Widget, the Taboola Sponsored Content, or the reliability, reputation or goodwill of any of them*; (c) *modify, change, edit, amend, truncate, alter, bypass or reorder any aspect of the Widget or Recommendations*; (d) generate clicks on Recommendations, or generate Recommendation Pageviews (as defined below), through any automated, deceptive, fraudulent or other means that is designed to generate clicks or Recommendation Pageviews that are not the willing actions of human end users who possess an independent, genuine desire to engage with the content that appears on the relevant page(s), including but not limited to, through (i) repeated manual clicks, use of robots or other automated tools or computer generated requests, (ii) participation in pay‑per‑click programs, (iii) redirection of search requests to pages that do not contain content reasonably relevant to the search query, or (iv) the provision of consideration to any third party in exchange for the third party causing any clicks or Recommendation Pageviews to occur; (e) copy, crawl, index, cache or store any information derived by Taboola, or contained in or concerning a Recommendation; or (f) provide Taboola any personally identifiable information concerning any Visitor or other person ("PII"). Clause (d) of the previous sentence shall be deemed to have been violated by any Recommendation Pageviews that Taboola reasonably determines were the result of transfers or referrals of Visitors to a Website by a third party content distribution service provider and that resulted in a monthly click‑through rate that was less than fifty percent (50%) of the click‑through rate experienced by the remainder of the Recommendation Pageviews that occurred on the Website during the same month.

Ezoic Agreement ¶ 2 (emphasis added).

90.    Defendants have breached the Non-Disparagement Clause by disparaging Plaintiff's products and services to the four Publishers, and upon information and belief, to other Plaintiff publishers as well.  Defendants have disparaged Plaintiff by telling Plaintiff's four Publishers (and upon information and belief, other existing and prospective publishers) that Plaintiff's Content Discovery Platform is inferior to, and generates less advertising revenue than, competing products, including Outbrain, and advising these publishers not to use Plaintiff's Content Discovery Platform.

91.    Defendants have breached the No Modification Clause by configuring the Publishers' websites to bypass and/or not display Plaintiff's Content Discovery Platform when

using Ezoic's Internet advertisement testing platform.  Upon information and belief, Defendants

have also done this with Plaintiff publishers other than the Publishers.

92.     The Ezoic Agreement contains an enforceable forum selection clause in which the

Defendants submit to the jurisdiction of the state and federal courts in New York.  This clause

reads:

> Choice of Law:  This Agreement will be governed by and construed in accordance
> with the laws of the State of New York excluding its conflicts of law principles.
> Any legal action or proceeding arising under this Agreement will be brought
> exclusively in the federal or state courts located in the County of New York, New
> York and the parties hereby irrevocably consent to personal jurisdiction and venue
> therein.

Ezoic Agreement ¶ 14.  The Ezoic Agreement expressly states that the forum selection

clause survives termination of the agreement.

**Plaintiff's Cease and Desist Letter**

93.     On May 25, 2017, Plaintiff sent a cease and desist letter to Ezoic, demanding that

it cease and desist from interfering with Plaintiff's business relationships.  This letter specifically

stated that JGN had an ongoing written contract with Taboola, in effect until June 2018, that

required JGN (1) to display Taboola's Content Discovery Platform on JGN's websites; and (2) not

to use content recommendation technologies belonging to Taboola's competitors, expressly

including Outbrain.

94.     Defendants tortiously interfered with the JGN Agreement both before and after

receiving the cease and desist letter on May 25, 2017.

95.     On July 7, 2017, Plaintiff's counsel sent a similar letter, again demanding that Ezoic

cease and desist from interfering with Plaintiff's business relationships.  This letter specifically

identified SwingxSwing as another Taboola publisher with whom Ezoic was similarly interfering.

96.     Defendants tortiously interfered with the SwingxSwing Agreement both before and after receiving the cease and desist letter on July 7, 2017.

97.     These cease and desist letters expressly informed Ezoic that Plaintiff's publisher agreements required its publishers to display Plaintiff's Content Discovery Platform throughout the contractual term and prohibited the publishers from using competing advertising or content recommendation technology.

98.     Ezoic has refused to comply with the cease and desist letters, and, upon information and belief, is continuing to disparage Plaintiff and to advise, instruct, and cause Plaintiff publishers to breach their contracts with Plaintiff.

## COUNT ONE: TORTIOUS INTERFERENCE WITH CONTRACT
### (Against Ezoic)

99.     Plaintiff repeats and re-alleges each of the foregoing paragraphs as if fully set forth herein.

100.    Plaintiff has a valid and enforceable written contract with each of the Publishers. These Publisher Agreements, described above, are the JGN Agreement, the SwingxSwing Agreement, the Precision Creations Agreement, and the TechSoft Agreement.

101.    Plaintiff has performed its obligations under the Publisher Agreements by, among other things, providing and servicing the Content Discovery Platform on the Publishers' websites and sharing advertising revenues with the Publishers as per the contractually specified formula in the Publisher Agreements.

102.    Ezoic was aware and had actual knowledge of the existence and material terms of the Publisher Agreements, including specific knowledge of the requirements that the Publishers display Plaintiff's Content Discovery Platform on their websites for the duration of the contract's term and the exclusivity clauses prohibiting the Publishers from utilizing competing content

19

recommendation technology.  Ezoic had actual knowledge of these contracts through one or more of the following means: 1) the terms of their own substantially identical publisher agreement with Taboola; 2) the publicly available Publishers Terms and Conditions listed on Taboola's website; 3) the cease and desist letters sent by Plaintiff; 4) Ezoic's communications with the Publishers; and 5) Ezoic's knowledge, based on its own dealings with Taboola and publicly available information, that Taboola only makes its Content Recommendation Technology available to websites that have an ongoing contract with Taboola requiring the website to display the Content Recommendation Technology.

103.    Ezoic directly and intentionally caused the Publishers to breach their contractual obligations to Plaintiff.  Ezoic advised and instructed the Publishers to breach their contracts with Plaintiff without justification by removing Plaintiff's Content Discovery Platform from their websites and by replacing it with competitors' content recommendation technologies.  Ezoic has also taken active measures to implement code in Ezoic's Internet advertisement testing platform that blocks Plaintiff's technology from appearing on the Publishers' websites, forcing these Publishers into a breach of their agreements with Plaintiff.

104.    Ezoic has continuously tortiously interfered with the Publisher Agreements by continuously taking active measures to prevent Taboola's Content Recommendation Technology from rendering on the Publishers' websites as required by the Publisher Agreements.

105.    Were it not for Ezoic's tortious acts, the Publishers would not have breached the Publisher Agreements with Plaintiff.

106.    Upon information and belief, Ezoic has similarly tortiously interfered with other Plaintiff publisher agreements in addition to the four Publisher Agreements and are continuing to do so.

107.    As a direct, proximate, natural, and foreseeable result of Ezoic's tortious interference with Plaintiff's publisher agreements, Plaintiff has suffered damages, including advertising revenues that Plaintiff would have received if Ezoic had not tortiously interfered with Plaintiff's publisher agreements.  These damages are in an amount to be determined at trial, but in no event less than $180,994.

## COUNT TWO: BREACH OF CONTRACT
### (Against All Defendants)

108.    Plaintiff repeats and re-alleges each of the foregoing paragraphs as if fully set forth herein.

109.    The Ezoic Agreement between Plaintiff and Defendants is a valid, legally enforceable written agreement.

110.    Plaintiff has performed its obligations under the Ezoic Agreement by, among other things, providing and servicing the Content Discovery Platform on the internetslang.com website and sharing advertising revenues with Defendants as per the contractually specified formula in the Ezoic Agreement.

111.    The Defendants have breached the Ezoic Agreement by failing to display the Content Discovery Platform on their website from October 2014 to August 2017.  This breach prevented Plaintiff from receiving advertising revenues that it otherwise would have received through Defendants' website.

112.    The Defendants have breached the Non-Disparagement Clause of the Ezoic Agreement by making disparaging comments about Plaintiff to Plaintiff's publishers during the term of the Ezoic Agreement.  This breach prevented Plaintiff from receiving advertising revenues that it otherwise would have received through the publishers to whom Defendants made these disparaging remarks.

113.   The Defendants have breached the No Modification Clause of the Ezoic Agreement by configuring the Publishers' websites to bypass and/or not display Plaintiff's Content Discovery Platform during the term of the Ezoic Agreement.  This breach prevented Plaintiff from receiving advertising revenues that it otherwise would have received through the publishers with whom Defendants interfered.

114.   As a direct, proximate, natural, and foreseeable result of Defendants' breaches of the Ezoic Agreement,  Plaintiff has suffered damages, including advertising revenues that Plaintiff would have received if Defendants had not breached the Ezoic Agreement.  These damages are in an amount to be determined at trial, but in no event less than $180,994.

## COUNT THREE: INJUNCTIVE RELIEF
### (Against Ezoic)

115.   Plaintiff repeats and re-alleges each of the foregoing paragraphs as if fully set forth herein.

116.   Ezoic, through its continuing pattern of causing breaches of the contracts between Plaintiff and its publishers, and its recommendations that Plaintiff's publishers use the services of Plaintiff's competitors instead, have caused and are continuing to cause irreparable harm to Plaintiff, including but not limited to the following:

a.   Diminishing Plaintiff's competitive position in the marketplace;

b.   Damaging Plaintiff's business reputation and goodwill in the marketplace;

c.   Depriving Plaintiff of the benefits of its exclusive contract with its publishers, including but not limited to the ability to negotiate exclusive contracts with other Internet publishers whose brand profile and recognition are similar;

d.   Undermining Plaintiff's ability to negotiate and maintain its existing business relationships with publishers and third-party advertisers; and

e.      Undermining Plaintiff's credibility with existing and prospective publishers and advertisers.

117.    Plaintiff has no adequate remedy at law.

118.    The balance of the equities favors Plaintiff.

119.    Accordingly, an injunction should be issued enjoining Ezoic from (1) further advising or instructing Plaintiff's publishers to remove Plaintiff's Content Discovery Platform from their websites in breach of their contractual obligations; or (2) preventing Plaintiff's Content Discovery Platform from properly rendering on any of Plaintiff's publishers' websites, either through the configuration of Ezoic's Internet advertising testing platforms or through any other means.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Taboola respectfully demands judgment in this action as follows:

A.      Awarding judgment for Plaintiff Taboola, jointly and severally against both Defendants for damages in an amount to be determined at trial, but no less than $180,994, plus interest, together with attorneys' fees, costs, and disbursements of this action; and

B.      Enjoining Ezoic from (1) further advising or instructing Plaintiff's publishers to remove Plaintiff's Content Discovery Platform from their websites in breach of their contractual obligations; or (2) preventing Plaintiff's Content Discovery Platform from properly rendering on any of Plaintiff's publishers' websites, either through the configuration of Ezoic's Internet advertising testing platforms or through any other means.

C.      Awarding such further relief as the Court deems just and proper.

DATED:      May 7, 2018
            New York, New York

                                       SHER TREMONTE LLP

                                       By: _/s/ Mark Cuccaro_____
                                            Michael Tremonte
                                          Mark Cuccaro
                                       90 Broad Street, 23rd Floor
                                       New York, New York 10004
                                       Tel:  (212) 202-2600
                                       mtremonte@shertremonte.com
                                       mcuccaro@shertremonte.com
                                       *Attorneys for Plaintiff Taboola, Inc.*