UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X

TABOOLA, INC.,

17 Civ. 9909
OPINION

                    Plaintiff,

        -against-

EZOIC INC. and DWAYNE LAFLEUR,

                    Defendants.

----------------------------------------X

A P P E A R A N C E S:

            Attorney for Plaintiff

        SHER TREMONTE LLP
        90 Broad Street, 23rd Floor
        New York, NY 10004
        By:  Mark Elliot Cuccaro


            Attorneys for Defendants

        LATHAM & WATKINS LLP
        885 Third Avenue
        New York, NY 10022
        By:  Benjamin Naftalis
             Virginia Foster Tent

        LATHAM & WATKINS LLP
        12670 High Bluff Drive
        San Diego, CA 92130
        By:  Jake Ryan

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

Sweet, D.J.

Defendants Ezoic Inc. ("Ezoic") and Dwayne Lafleur ("Lafleur") (collectively, the "Defendants") have moved pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6) to dismiss the Amended Complaint ("AC") of plaintiff Taboola, Inc. ("Taboola") claiming breach of contract and tortious interference with Plaintiff's business relationships. Upon the conclusions set forth below, the motion is denied.

## I. Prior Proceedings

On December 19, 2017, Plaintiff filed its Complaint. ECF No. 1. On May 7, 2018, Plaintiff filed its AC alleging that Ezoic tortiously interfered with four contracts Plaintiff entered into with internet website providers and that Ezoic and Lafleur breached a separate contract that Ezoic and Lafleur signed with Taboola. ECF No. 26, ¶¶ 99-114. Defendants filed their motion to dismiss the AC on June 8, 2018. ECF No. 27.

The instant motion was heard and marked fully submitted on July 18, 2018.

II.  The Facts

     The AC sets forth the following facts, which are
assumed true for the purpose of this motion to dismiss. *See Koch
v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

     Plaintiff is one of the world's leading targeted
digital advertising technology companies. AC ¶ 12. Its content
recommendation technology (the "Content Recommendation
Technology") (referred to in Plaintiff's agreements as the
"Widget") reaches more than one billion Internet users and
offers more than 360 billion recommendations each month. *Id.* As
part of its business, Plaintiff enters into agreements with
Internet publishers, such as CBS, NBC, USA Today, and The
Weather Channel, to be the exclusive provider of content
recommendations that help monetize the websites and digital
properties that these publishers own and/or operate. *Id.* ¶ 13.

     Plaintiff provides code for its proprietary Content
Recommendation Technology, which publishers place on their
website and digital properties. *Id.* ¶ 14. The Content
Recommendation Technology then appears on the publisher's
websites, typically below the header (*e.g.*, "Content You May
Like," "Recommended for You," or "Around the Web") and

recommends sponsored articles and advertisements ("Content") (referred to in the agreements as the "Taboola Sponsored Content") to each visitor of the websites, based upon the visitor's particular interests (collectively, the "Recommendations"). *Id.* Content may be provided by a sponsoring advertiser, third-party publisher, or by the publisher itself for the promotion of its own editorial content. *Id.*

When a visitor clicks on a Recommendation, the visitor is directed away from the publisher's website to the website of a third party that paid for the distribution of the recommended Content. *Id.* ¶ 15. This sponsoring third party pays Plaintiff a contractually-specified sum, called a "Cost Per Click," each time a visitor clicks on its Content link. *Id.* Plaintiff then pays the publisher a percentage of Plaintiff's revenues from each click pursuant to a contractually-specified formula. *Id.*

Julio Garcia Network ("JGN"), Swing by Swing Golf, Inc. ("SwingxSwing"), Precision Creations, LLC ("Precision Creations"), and TechSoft IT Solutions ("TechSoft") (collectively, the "Publishers") are among the publishers with whom Plaintiff does business pursuant to written contracts. *Id.* ¶ 16. Plaintiff's contracts with each of the Publishers (the "Publisher Agreements") require the Publishers to display

3

Plaintiff's Content Recommendation Technology on the Publishers'
websites throughout the contractual term. *Id.* ¶ 17. The terms of
the Publisher Agreements are substantially identical to the
terms of the Defendants' contract with Plaintiff. *Id.* ¶ 18. They
are also substantially identical to the "Publisher Terms and
Conditions" that have been publicly listed on Taboola's website
throughout all timeframes at issue in this action.[1] *Id.*

Ezoic provides an Internet advertisement testing
platform for its customers. *Id.* ¶ 19. Ezoic's customers download
Ezoic's web browser extension, which allows them to test
different combinations of advertisement placement locations and
sizes for their websites. *Id.* Ezoic then recommends ways that
its customers can optimize ad revenue and user experience. *Id.*

Ezoic has over 30,000 sites registered to its platform
with over half a billion visitors per day. *Id.* ¶ 20. Ezoic has
multiple offices in California and in the United Kingdom. *Id.*
Ezoic provides services through its Internet advertisement
testing platform to numerous customers based in New York from
which it derives substantial revenue. *Id.* Ezoic's customers are
located worldwide and Ezoic derives substantial revenue from

---

[1]    A version of the Publisher Terms and Conditions are publicly viewable
at https://www.taboola.com/publisher-revshare-terms-and-conditions-1.3-US.

interstate and international commerce. *Id.* Ezoic's form
Affiliate Agreement contract, publicly available on its website,
is expressly governed by the laws of the state of New York. *Id.*
¶ 21.

Plaintiff alleges that, beginning no later than March
2017, Ezoic has advised, encouraged, and instructed at least
four of Plaintiff's Publishers to breach their contracts with
Plaintiff by removing Plaintiff's Content Recommendation
Technology from their websites, and has done so with full
knowledge that removing Plaintiff's Content Recommendation
Technology would constitute a breach of the Publishers'
contractual obligations. *Id.* ¶ 22.

### Plaintiff's Agreements with Publishers

JGN entered into a publisher agreement with Taboola
dated June 7, 2016 (the "JGN Agreement"). *Id.* ¶ 23. SwingxSwing
entered into a publisher agreement with Taboola dated April 23,
2014 (the "SwingxSwing Agreement."). *Id.* ¶ 37. Precision
Creations entered into a publisher agreement with Taboola dated
January 1, 2015 (the "Precision Creations Agreement."). *Id.* ¶
55. TechSoft entered into a publisher agreement with Taboola
dated June 1, 2010 (the "TechSoft Agreement."). *Id.* ¶ 67.

The key material terms of these Publisher Agreements
are as follows: (1) the Publishers will display Taboola's
Content Recommendation Technology on their respective websites
throughout the contractual term; and (2) Taboola and the
Publishers will share the revenues that Taboola receives from
third party websites to which viewers are redirected after
clicking on a Recommendation on the Publishers' websites,
pursuant to a specified contractual formula. *Id.* ¶ 24, 38, 56,
68. Throughout the term of the Publisher Agreements, each of the
Publishers is required to display Taboola's Content
Recommendation Technology on their websites. *Id.* ¶¶ 24, 39, 57,
69. In addition, throughout the term of their respective
agreements, JGN, SwingxSwing, and TechSoft are all prohibited
from using content recommendation technologies belonging to
Taboola's competitors on its websites. *Id.* ¶¶ 26, 40, 70. The
JGN and SwingxSwing Agreements specifically name Outbrain as a
competitor of Taboola. *Id.* ¶¶ 26, 40.

*The JGN Agreement*

The JGN Agreement will not expire until June 2018 at
the earliest, as the original term of the contract was for one
year beginning on June 7, 2016. *Id.* ¶ 27. On June 7, 2017, the

6

JGN Agreement was renewed for an additional one-year term, lasting through June 7, 2018. *Id.* JGN is one of Plaintiff's publishers that uses Ezoic's services. *Id.* ¶ 28.

Plaintiff alleges that JGN discussed the material terms of the JGN Agreement with Ezoic, including the requirement that JGN display Taboola's Content Recommendation Technology on its websites throughout the contractual term. *Id.* ¶ 29. In late April 2017, Plaintiff noticed that the code for its Content Recommendation Technology was no longer appearing on JGN's websites. *Id.* ¶ 30. In its place, content recommendations from Outbrain, one of Plaintiff's main competitors, appeared on JGN's website instead. *Id.* When Plaintiff asked JGN why it was no longer displaying Plaintiff's Content Recommendation Technology, JGN responded that it was using Ezoic's services, and that Ezoic had deliberately configured its ad tester platform to prevent Plaintiff's Content Recommendation Technology from displaying. *Id.* ¶ 31. Ezoic had suggested to JGN that it run ads from Outbrain instead of Plaintiff, which JGN agreed to do. *Id.* On May 15, 2017, JGN forwarded Plaintiff an email that it had received from Ezoic, which read in relevant part:

> Taboola is no longer allowed to run alongside Ezoic products. We've noticed Taboola has been randomly injecting ads which our system is not able to track as

> part of the tests; causing a bad user experience.
> Since they interfere with Ezoic, Taboola will not show
> when Ezoic is turned On. If you would like to consider
> running native ads on Ezoic versions, we could run
> Outbrain ads for you in their place. Would you be open
> to this? *Id.* ¶ 32.

Plaintiff alleges that Ezoic had actual knowledge of the JGN Agreement, including specific knowledge of the requirement that JGN display Taboola's Content Recommendation Technology on its website throughout the contractual term. *Id.* ¶ 33. Plaintiff further alleges that Ezoic directly and intentionally caused JGN to breach the JGN Agreement by preventing Taboola's Content Recommendation Technology from displaying on JGN's websites, that JGN would not have breached the JGN Agreement but for Ezoic's tortious interference, and that Ezoic directly and intentionally caused a further breach of the JGN Agreement by successfully persuading JGN to run content recommendations from Outbrain instead of Plaintiff. *Id.* ¶ 34-35. According to Plaintiff, to date, JGN's websites are displaying content recommendations from Plaintiff's competitors instead of Plaintiff, in violation of the JGN Agreement, and Ezoic is continuously interfering with the JGN Agreement by intentionally blocking Taboola's Content Recommendation Technology from rendering on JGN's website. *Id.* ¶ 35-36.

*The SwingxSwing Agreement*

8

The SwingxSwing Agreement remained in effect until April 23, 2018, as the original term of the contract was for one year beginning on April 23, 2014 and was renewed for an additional year in 2015, 2016, and 2017. *Id.* ¶ 41. SwingxSwing also uses Ezoic's services. *Id.* ¶ 42. Plaintiff alleges that SwingxSwing discussed the material terms of the SwingxSwing Agreement with Ezoic, including the requirement that SwingxSwing display Taboola's Content Recommendation Technology on its website throughout the contractual term. *Id.* ¶ 43. SwingxSwing allegedly breached the SwingxSwing Agreement by removing Plaintiff's Content Recommendation Technology from its website on March 17, 2017. *Id.* ¶ 44.

In or around early 2017, purportedly to enable it to "optimize performance" on SwingxSwing's websites, Ezoic requested that Plaintiff provide it with proprietary and confidential information showing where Plaintiff displays specific advertisers across its entire network of publishers. *Id.* ¶ 45. In the interests of protecting the privacy of its business partners and keeping Plaintiff's own proprietary information out of the hands of competitors, Plaintiff refused to provide this information. *Id.* On March 17, 2017, the CEO of SwingxSwing, Charles Cox ("Cox") informed Plaintiff by email

9

that it had decided to stop using Plaintiff as the result of a
recommendation from Ezoic. *Id.* ¶ 46. This email from Cox read,
in relevant part:

> After lengthy discussions with our banner advertising
> consultant & partner, Ezoic, we have decided to stop
> using Taboola as a source of advertising for the next
> few weeks. Ezoic and its software's algorithm optimize
> where and when we show any banner / video advertising
> of any kind on our desktop and mobile website.
> Unfortunately, giving Taboola the space we currently
> do today does not allow us to test whether Taboola
> native ads are additive or dilutive relative to what
> we could get via other sources, and we need to allow
> Ezoic to test all of its advertiser sources from
> Google and other partners, using header bidding and
> other tactics. *Id.* ¶ 47.

In another email, dated April 4, 2017, Cox informed
Plaintiff that it had "handed all inventory over to Ezoic" and
that Ezoic was "testing [their] inventory with its own certified
partners." *Id.* ¶ 48. At or around the time of these emails,
SwingxSwing removed Plaintiff's Content Recommendation
Technology from its websites and began running content
recommendations from Outbrain instead. *Id.* ¶ 49. Plaintiff
alleges that its competitor Outbrain is one of the "certified
partners" of Ezoic referenced by Cox. *Id.* ¶ 49. According to
Plaintiff, SwingxSwing's replacement of Plaintiff's Content
Recommendation Technology with Outbrain's competing content
recommendation technology constituted an ongoing breach of

10

SwingxSwing's contract with Plaintiff through April 23, 2018.
*Id.* ¶ 50.

On June 7, 2017, SwingxSwing sent a letter to
Plaintiff seeking to terminate its contract with Plaintiff ten
months early and explaining that it had "engaged a consultant
[Ezoic] to advise it" regarding Plaintiff's services. *Id.* ¶ 51.
As a purported justification for its termination, SwingxSwing
claimed that Ezoic cannot "test new ad types and locations" due
to Plaintiff's unwillingness to share proprietary information
with Ezoic. *Id.* Plaintiff alleges that, absent Ezoic's
recommendations, SwingxSwing would not have breached its
contract with Plaintiff. *Id.* ¶ 52. Plaintiff further claims that
Ezoic had actual knowledge of the SwingxSwing Agreement,
including specific knowledge of the requirement that SwingxSwing
display Taboola's Content Recommendation Technology on its
website throughout the contractual term. *Id.* ¶ 53. According to
Plaintiff, Ezoic has continued to tortiously interfere with the
SwingxSwing Agreement throughout the duration of the contract's
term by urging SwingxSwing not to display the Content
Recommendation Technology and by intentionally preventing the
Content Recommendation Technology from rendering on
SwingxSwing's website. *Id.* ¶ 54.

11

*The Precision Creations Agreement*


The Precision Creations Agreement will not expire
until January 1, 2019 at the earliest, as the original term of
the contract was for one year beginning on January 1, 2015 and
was renewed for additional one-year terms in 2016, 2017, and
2018. *Id.* ¶ 58. On June 1, 2017, Plaintiff's Content
Recommendation Technology was removed from Precision Creations'
website. *Id.* ¶ 59. Precision Creations uses Ezoic's ad testing
platform. *Id.* ¶ 60.


Plaintiff alleges that Precision Creations discussed
the material terms of the Precision Creations Agreement with
Ezoic, including the requirement that Precision Creations
display Taboola's Content Recommendation Technology on its
website throughout the contractual term. *Id.* ¶ 61. On June 8,
2017, in response to Plaintiff's inquiry regarding why the
Content Recommendation Technology was not being displayed,
Joshua Wychopen ("Wychopen"), the CEO of Precision Creations,
informed Plaintiff that Ezoic had blocked Plaintiff's Content
Recommendation Technology from appearing on Precision Creations'
websites. *Id.* ¶ 62. This email from Wychopen read, in relevant
part: "We reached out to the Ezoic support team and they said
this, 'We found a few instances where Taboola was randomly

injecting ads on the page and it was interfering with our system
so we have to automatically remove it.'" *Id.* ¶ 63.

Plaintiff claims that Ezoic had actual knowledge of
the Precision Creations Agreement, including specific knowledge
of the requirement that Precision Creations display Taboola's
Content Recommendation Technology on its website throughout the
contractual term. *Id.* ¶ 65. Plaintiff alleges that Ezoic
procured a breach of the Precision Creations Agreement by
intentionally removing Taboola's Content Recommendation
Technology from Precision Creations' website, and that Precision
Creations would not have breached the Precision Creations
Agreement but for Ezoic's tortious interference. *Id.* ¶ 66.

*The TechSoft Agreement*

The TechSoft Agreement will not expire until June 1,
2018 at the earliest because the original term of the contract
was for one year beginning on June 1, 2010 and was renewed for
additional one-year terms in 2011, 2012, 2013, 2014, 2015, 2016,
and 2017. *Id.* ¶ 71. In emails from May-July 2017, TechSoft
informed Plaintiff that it would not run Plaintiff's Content
Recommendation Technology on its website at various times

13

because it wished to run Ezoic's ad testing platform instead. *Id.* ¶ 72.

Plaintiff alleges that TechSoft discussed the material terms of TechSoft Agreement with Ezoic, including the requirement that TechSoft display Taboola's Content Recommendation Technology on its website throughout the contractual term. *Id.* ¶ 73. According to Plaintiff, TechSoft breached the TechSoft Agreement from May 6 - May 29, 2017 and again from May 30 - August 3, 2017 by removing Plaintiff's Content Recommendation Technology from its website. *Id.* ¶ 74. Taboola contends that Ezoic had actual knowledge of the TechSoft Agreement, including specific knowledge of the requirement that TechSoft display Taboola's Content Recommendation Technology on its website throughout the contractual term. *Id.* ¶ 76. Taboola also alleges that TechSoft would have not have breached the TechSoft Agreement but for Ezoic's tortious interference. *Id.* ¶ 77.

## Plaintiff's Contract with Defendants

On or around August 12, 2014, Plaintiff entered into a standard publisher agreement with Ezoic and Lafleur (the "Ezoic Agreement"), which is substantially identical to Taboola's other

14

publisher agreements, including the Publisher Agreements just described. *Id.* ¶ 78. The Ezoic Agreement was entered into by Lafleur both individually and on behalf of Ezoic. *Id.* ¶ 84. Plaintiff alleges that, at the time the Ezoic Agreement was executed, Defendants were aware that Taboola is based in New York and that the Ezoic Agreement was governed by New York law and subject to enforcement in New York courts. *Id.* ¶ 79.

The key material terms of the Ezoic Agreement are that (1) Ezoic will display Taboola's Content Recommendation Technology on its website, internetslang.com, throughout the contractual term; and (2) Taboola and Ezoic will share the revenues that Taboola receives from third party websites to which viewers are redirected after clicking on a Recommendation on Ezoic's website, pursuant to a specified contractual formula. *Id.* ¶ 80. Throughout the term of the Ezoic Agreement, Ezoic was required to display Taboola's Content Recommendation Technology on its website and is prohibited from using content recommendation technologies belonging to Taboola's competitors, including Outbrain. *Id.* ¶ 81-82. Plaintiff contends that, because these terms are in the Ezoic Agreement, Defendants have been aware since 2014 that Plaintiff has these requirements in its standardized publisher agreements. *Id.* ¶ 85.

The Ezoic Agreement was terminated by Defendants at
the end of the term of its second renewal period, effective
August 12, 2017, but remained in full effect up until that date.
*Id.* ¶ 83. The original term of the Ezoic Agreement was for one
year beginning on August 12, 2014 and was renewed for additional
one-year terms in 2015 and 2016. *Id.* ¶ 83.

According to Plaintiffs, Defendants stopped displaying
the Content Recommendation Technology in October 2014, and were
therefore in breach of the Ezoic Agreement from October 2014
until the contract's termination in August 2017. *Id.* ¶ 86.
Plaintiffs contend that this breach caused Plaintiff to lose
advertising revenue that it otherwise would have received
through Defendants' website. *Id.* ¶ 86.

At Paragraph 2, the Ezoic Agreement also contains a
non-disparagement clause (the "Non-Disparagement Clause") that
prohibits Defendants from engaging "in any action or practice
that disparages or devalues Plaintiff, the Widget, the Taboola
Sponsored Content, or the reliability, reputation or goodwill of
any of them," *id.* ¶ 87, and another clause that prohibits
Defendants from modifying, changing, editing, amending,
truncating, altering, bypassing, or reordering any aspect of
Taboola's "Widget or Recommendations" (the "No Modification

Clause"), *id.* ¶ 88. Plaintiff contends that No Modification
Clause prohibits modifying or bypassing the Widget on either
Ezoic's own website or on any other website. *Id.* ¶ 88.

According to Plaintiff, Defendants breached the Non-
Disparagement Clause by disparaging Plaintiff's products and
services to the four Publishers, and to other Plaintiff
publishers as well, by telling them that Plaintiff's Content
Recommendation Technology is inferior to, and generates less
advertising revenue than, competing products, including
Outbrain, and advising these publishers not to use Plaintiff's
Content Recommendation Technology. *Id.* ¶ 90.

Plaintiff alleges that Defendants have breached the No
Modification Clause by configuring the Publishers' websites to
bypass and/or not display Plaintiff's Content Recommendation
Technology when using Ezoic's Internet advertisement testing
platform. *Id.* ¶ 91. Plaintiff asserts that Defendants have also
done this with publishers other than the four specifically
identified in this action. *Id.* ¶ 91.

Plaintiff also alleges that Paragraph 14 of the Ezoic
Agreement contains an enforceable forum selection clause in

which the Defendants submit to the jurisdiction of the state and federal courts in New York. *Id.* ¶ 92. This clause reads:

> Choice of Law: This Agreement will be governed by and construed in accordance with the laws of the State of New York excluding its conflicts of law principles. Any legal action or proceeding arising under this Agreement will be brought exclusively in the federal or state courts located in the County of New York, New York and the parties hereby irrevocably consent to personal jurisdiction and venue therein. *Id.*

Plaintiff alleges that the Ezoic Agreement expressly states that the forum selection clause survives termination of the agreement. *Id.*

### Plaintiff's Cease and Desist Letter

On May 25, 2017, Plaintiff sent a cease and desist letter to Ezoic, demanding that it cease and desist from interfering with Plaintiff's business relationships. *Id.* ¶ 93. This letter specifically stated that JGN had an ongoing written contract with Taboola, in effect until June 2018, that required JGN (1) to display Taboola's Content Recommendation Technology

18

on JGN's websites; and (2) not to use content recommendation technologies belonging to Taboola's competitors, expressly including Outbrain. *Id.* ¶ 93. On July 7, 2017, Plaintiff's counsel sent a similar letter, again demanding that Ezoic cease and desist from interfering with Plaintiff's business relationships and specifically identifying SwingxSwing as another Taboola publisher with whom Ezoic was similarly interfering. *Id.* ¶ 95.

According to Plaintiff, these cease and desist letters expressly informed Ezoic that Plaintiff's publisher agreements required its publishers to display Plaintiff's Content Recommendation Technology throughout the contractual term and prohibited the publishers from using competing advertising or content recommendation technology. *Id.* ¶ 97. Taboola alleges that Ezoic has refused to comply with the cease and desist letters, and, upon information and belief, is continuing to disparage Plaintiff and to advise, instruct, and cause Plaintiff's publishers to breach their contracts with Plaintiff. *Id.* ¶ 98.

As a result of the foregoing events, Plaintiffs filed the present action.

III. The Defendants' Motion to Dismiss the AC on Personal
     Jurisdiction Grounds is Denied

A. Applicable Standard

In order to avoid dismissal for lack of personal
jurisdiction under Rule 12(b)(2), plaintiffs must establish
personal jurisdiction with respect to each defendant. *See*
*Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 137 S. Ct.
1773, 1783 (2017). "Where a court has chosen not to conduct a
full-blown evidentiary hearing on the motion, the plaintiff need
make only a prima facie showing of jurisdiction through its own
affidavits and supporting materials." *Marine Midland Bank, N.A.*
*v. Miller,* 664 F.2d 899, 904 (2d Cir. 1981). Accordingly, the
pleadings are construed "in the light most favorable to
plaintiffs." *Pornia v. Marward Shipping Co.*, 521 F.3d 122, 126
(2d Cir. 2008).

"Parties can consent to personal jurisdiction through
forum-selection clauses in contractual agreements." *D. H. Blair*
*& Co., Inc. v. Gottdiener*, 462 F.3d 95, 104 (2d Cir. 2006)
(citing *Nat'l Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311,
315-16 (1964)). "For a forum selection clause to apply, the
party seeking enforcement must demonstrate that (1) the clause

20

was reasonably communicated to the party resisting enforcement; (2) the clause was mandatory and not merely permissive; and (3) the claims and parties involved in the suit are subject to the forum selection clause." *Flame-Spray Indus. Inc. v. GTC Auto. GmbH*, 266 F. Supp. 3d 608, 616 (E.D.N.Y. 2017) (internal quotation marks and citations omitted). "Forum selection clauses are *prima facie* valid and should be enforced unless enforcement is shown by the resisting party to be unreasonable under the circumstances" or "unless the forum selection clause was invalid for such reasons as fraud or overreaching." *Magi XXI, Inc. v. Stato della Citta del Vaticano*, 714 F.3d 714, 720-21 (2d Cir. 2013) (internal quotation marks and citations omitted). Courts give "substantial deference to the forum selected by the parties, particularly where this choice was made in an arm's-length negotiation by experienced and sophisticated businessmen." *Id.* at 721 (internal quotation marks and citations omitted).

B. The Forum Selection Clause is Valid and Enforceable

Plaintiff has alleged that the Ezoic Agreement was entered into by Lafleur both individually and on behalf of Ezoic, AC ¶ 84, and that the Ezoic Agreement contains an enforceable forum selection clause in which the Defendants

21

submit to the jurisdiction of the state and federal courts in New York, *id.* ¶ 92. Defendants do not argue that the forum selection clause was not reasonably communicated or that it is permissive. Instead, they argue (1) that the AC "contains no specific factual allegations that would show that the clause survived termination of the contract and is enforceable against either Ezoic or [Lafleur]"; and (2) that "[a]t the very least, the clause would apply only to the breach of contract claim" because the provision "is expressly limited to '[a]ny legal action or proceeding arising under this Agreement." Defs.' Br. at 28-29.

These arguments fail. Plaintiff alleges that the provision contained a survival clause, AC ¶ 92, and in any event, a contract's forum selection clause remains effective even after termination of the contract "where, as here, the plaintiff's claims involve rights arising out of the contract and the entire business relationship between the parties stems from that contract." *Weingard v. Telepathy, Inc.*, No. 05 Civ. 2024, 2005 WL 2990645, at *3 (S.D.N.Y. Nov. 7, 2005) (citing *AGR Fin. LLC v. Ready Staffing, Inc.*, 99 F. Supp. 2d 399, 402 (S.D.N.Y. 2000) and *Young Women's Christian Ass'n of the U.S.*, No. 91 Civ. 7943, WL 279361 (S.D.N.Y. Sept. 25, 1992)).

Moreover, the forum selection clause covers Taboola's breach of contract and tortious interference claims. It is true that a plaintiff "must establish the court's jurisdiction with respect to *each* claim asserted." *Sunward Elecs.*, 362 F.3d at 24. However, "[w]hen 'arising out of,' 'relating to,' or similar words appear in a forum selection clause," as is the case here, "such language is regularly construed to encompass . . . tort claims associated with the underlying contract." *Credit Suisse Sec. (USA) LLC v. Hilliard*, 469 F. Supp. 2d 103, 107 (S.D.N.Y. 2007). "Put another way, contract-related tort claims involving the same operative facts as a parallel claim for breach of contract should be heard in the forum selected by the contracting parties." *BMW of N. Am. LLC v. M/V Courage*, 254 F. Supp. 3d 591, 597 (S.D.N.Y. 2017). Here, the tortious interference claim is associated with the underlying contract, as determining whether Defendants breached the No Modification and Non-Disparagement Clauses in the Ezoic Agreement will necessarily involve determining the same facts at issue in the tortious interference claim.

Accordingly, the forum selection clause is enforceable under New York law and Defendants' motion to dismiss for lack of

personal jurisdiction is denied.[2] *See, e.g.*, *Koninklijke Philips Elecs. v. Digital Works, Inc.*, 358 F. Supp. 2d 238, 333 (S.D.N.Y. 2005) ("A valid forum selection clause establishes sufficient contacts with New York for purposes of jurisdiction and venue.").

## IV. The Motion to Dismiss for Failure to State a Claim is Denied

### A. Applicable Standard

On a Rule 12(b)(6) motion to dismiss, all factual allegations in the complaint are accepted as true, and all inferences are drawn in favor of the pleader. *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir. 1993). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not

---

[2]     Although the parties also discuss whether personal jurisdiction exists based on New York's long-arm statute, this analysis is unnecessary given that the Defendants are bound by the forum selection clause contained in the Ezoic Agreement. *See, e.g.*, *U.S. Bank Nat'l Ass'n v. Ables & Hall Builders*, 582 F. Supp. 2d 605, 615-16 (S.D.N.Y. 2008) ("Where an agreement contains a valid and enforceable forum selection clause, it is not necessary to analyze jurisdiction under New York's long-arm statute or federal constitutional requirements of due process.").

suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also*
*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("[A]
plaintiff's obligation to provide the grounds of his entitlement
to relief requires more than labels and conclusions."). A
complaint must contain "sufficient factual matter, accepted as
true, to 'state a claim to relief that is plausible on its
face.'" *Iqbal*, 556 U.S. at 663 (quoting *Twombly*, 550 U.S. at
570).

A claim is facially plausible when "the plaintiff
pleads factual content that allows the court to draw the
reasonable inference that the defendant is liable for the
misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556). In
other words, the factual allegations must "possess enough heft
to show that the pleader is entitled to relief." *Twombly*, 550
U.S. at 557 (internal quotation marks omitted).

Additionally, while a plaintiff may plead facts
alleged upon information and belief "where the belief is based
on factual information that makes the inference of culpability
plausible," *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d
Cir. 2010), such allegations must be "accompanied by a statement
of the facts upon which the belief is founded," *Prince v.*
*Madison Square Garden*, 427 F. Supp. 2d 372, 384 (S.D.N.Y. 2006)

25

(internal quotations and citations omitted). Moreover, the pleadings "must contain something more than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." *Twombly*, 550 U.S. at 555 (citation and internal quotation omitted).

In considering a motion to dismiss, "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

> B. Taboola Has Stated a Claim for Tortious Interference
> with Contract

To plead a claim for tortious interference under New York law, a plaintiff "must show '(1) the existence of a valid contract between plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional procuring of the breach; and (4) damages.'" *White Plains Coat & Apron Co. v. Cintas Corp.*, 460 F.3d 281, 285 (2d Cir. 2006) (quoting *Foster v. Churchill*, 87 N.Y.2d 744, 750-51 (1996)). "In response to such a claim, a defendant may raise the economic interest defense--that it acted to protect its own

legal or financial stake in the breaching party's business."
*Kuhns v. Ledger*, 202 F. Supp. 3d 433, 441-42 (S.D.N.Y. 2016)
(citing *White Plains Coat & Apron Co. v. Cintas Corp.*, 8 N.Y.3d
422, 426 (2007)). "A plaintiff can overcome this defense by a
showing of 'malice or illegality.'" *Id.* (quoting *Foster*, 87
N.Y.2d at 750).

### 1. Taboola Has Alleged the Existence of the Publisher Agreements

Defendants argue that the first element of a tortious
interference claim is not met because "[a]t most, the AC alleges
that Taboola entered into contracts with each [Publisher]
several years ago that were renewed every year . . . and
sweeping statements regarding the terms," which were
"identically described for each [Publisher]." Defs.' Br. at 12.
Defendants further attempt to fault Plaintiff for not attaching
each Publishing Agreement to the AC, for not quoting the actual
terms of the contracts, and for not stating every specific
detail of the contracts, such as who executed them and the
specific terms of each alleged renewal. *Id.*

Under New York law, however, a plaintiff need only
"specifically plead the existence of a valid contract and

27

provide some details about its terms and its breach to sustain a [tortious interference with contract] claim at the motion to dismiss stage." *WorldHomeCenter.com, Inc. v. Franke Consumer Prods.*, 2011 WL 2565284, at *6 (S.D.N.Y. 2011). *Cf. Mayes v. Local 106, Int'l Union of Operating* Eng'rs, 739 F. Supp. 744, 748 (N.D.N.Y. 1990) ("A complaint . . . in a breach of contract action must . . . set forth the terms of the agreement upon which liability is predicated . . . [but] the plaintiff . . . is not required to attach a copy of the contract or to plead its terms verbatim."); *Stanley Works Israel Ltd. v. 500 Grp., Inc.*, 332 F. Supp. 3d 488, 506 (D. Conn. 2018) (rejecting argument that, in a breach of contract claim, plaintiffs must attach the contract at issue in order to adequately plead its existence).

Here, the AC plainly alleges the existence of written contracts with four specific publishers: JGN, SwingxSwing, Precision Creations, and TechSoft. AC ¶¶ 16-18, 23, 37, 55, 67. These allegations include the dates that each of the four Publisher Agreements were executed and renewed. *Id.* ¶¶ 23-24, 37-38, 55-56, 67-68. The AC also alleges the material terms of these contracts, namely: (1) that the Publishers would display Taboola's Content Recommendation Technology on their respective websites throughout the contractual term; and (2) Taboola and the Publishers would share the revenues that Taboola received

28

from third-party websites to which viewers are redirected after
clicking on a Recommendation on the Publishers' websites,
calculated pursuant to a specified contractual formula. *See id.*
The AC further alleges that while the Publisher Agreements were
in effect, Ezoic induced the Publishers to breach the material
terms requiring the Publishers to display Taboola's Content
Recommendation Technology on their websites. *Id.* ¶ 103.

Indeed, the allegations in the AC go well beyond those
at issue in *G-I Holdings, Inc. v. Baron & Budd*, the only case
cited by Defendants in support of their argument that Plaintiff
failed to plead the existence of the Publisher Agreements. In *G-I Holdings*, the plaintiff had merely alleged that it had a past
"contractual relationship" with a party under which the
plaintiff "investigated claims, tried cases, and negotiated
settlements on a bulk basis on behalf of all of its members,
thereby substantially reducing [the other party's] transaction
costs." 179 F. Supp. 2d 233, 253 (S.D.N.Y. 2001). Because the
plaintiff thus merely pled the interference with "contractual
relations" without referring to any "valid, existing contract or
any terms of contract with a third party," this Court determined
that the plaintiff failed to adequately plead the existence of a
contract. *Id.* Here, by contrast, Plaintiff has identified the
specific third parties with which it contracted; the dates on

which those contracts were executed and renewed; and the contracts' material terms, including the breached terms forming the basis of the tortious interference claim. At this stage of the litigation, such allegations are sufficient to plead the existence of valid, existing contracts. *See Restis v. Am. Coal. Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 728 n.14 (S.D.N.Y. 2014) (finding this element adequately pled where Plaintiffs stated that there were "valid and existing contracts" with two specified third-parties and that "agreements in principle" were in place for two other third-parties); *cf. Valley Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt. LLC.*, 455 F. App'x 102, 104 (2d Cir. 2012) (affirming dismissal of tortious interference claim where plaintiff failed to allege "the formation of the contract, the date it took place, and the contract's major terms").

## 2. Taboola Has Alleged Ezoic's Knowledge of the Publisher Agreements

"With respect to the second element [of a tortious interference with contract claim], although a defendant need not be aware of all the details of a contract, it must have actual knowledge of the specific contract." *Medtech Prods. Inc. v. Ranir, LLC*, 496 F. Supp. 2d 778, 796 (S.D.N.Y. 2008) (internal

quotation marks omitted). "[M]ere speculation unsupported by the specific allegations of actual knowledge" is not enough to survive a motion to dismiss a claim of tortious interference with contractual relations. *Id.* At the same time, however, "a plaintiff is not required to prove that the defendant had perfect or precise knowledge of the terms and conditions of the contracts in issue." *Guzik v. Albright*, No. 16 Civ. 2257, 2018 WL 4386084, at *6 (S.D.N.Y. Sept. 14, 2018); *see also B. Lewis Prods., Inc. v. Maya Angelou, Hallmark Cards, Inc.*, 2005 WL 1138474, at *13 (S.D.N.Y. May 12, 2005) (rejecting argument that "general knowledge of a contract's terms is not sufficient to satisfy the knowledge prong of a tortious interference claim").

Plaintiff has alleged, upon information and belief, that Ezoic had actual knowledge of the Publisher Agreements and the material terms. AC ¶¶ 29, 38, 43, 56, 61, 73. The AC further states five ways in which Ezoic allegedly came to possess such actual knowledge: (1) the terms of their own agreement with Taboola, which is substantially similar to the terms of the Publisher Agreements, *id.* ¶¶ 78-85; (2) the publicly available Publishers Terms and Conditions on Taboola's website, which mirror the terms of the Publisher Agreements, *id.* ¶ 18; (3) the cease and desist letters sent by Plaintiff, *id.* ¶¶ 93-98; (4) Ezoic's communications with the Publishers, *id.* ¶¶ 29, 38, 43,

56, 61, 73; and (5) Ezoic's own business dealings with Taboola
and publicly available information, which indicate that Taboola
only makes its Content Recommendation Technology available to
websites that have an ongoing contract with Taboola requiring
the website to display the Content Recommendation Technology,
*id.* ¶ 102.

Considered together, these allegations are adequate to
plead Ezoic's actual knowledge of the contract. *Cf. Kirch v.
Liberty Media Corp.*, 449 F.3d 388, 402 (2d Cir. 2006) (finding
actual knowledge of contract adequately pled where plaintiff
alleged that it "had a contract with [a specified third party],
of which the Defendants were aware, concerning the design and
implementation of [a project]").

### *3. Taboola Has Alleged That Ezoic Intentionally Procured Breaches of the Publisher Agreements Without Justification*

"To adequately allege that a defendant improperly and
intentionally interfered with performance of a contract, a
plaintiff must identify the contract(s) in question, allege
breach of the contract(s), and identify specific actions by the
defendant that induced the third party's breach." *Jasper &
Black, LLC v. Carolina Pad Co., LLC*, No. 10 Civ. 3562, 2012 WL

413869, at *9 (S.D.N.Y. Feb. 9, 2012). "The defendant's interference must be direct: 'the defendant must direct some activities towards the third party and convince the third party not to enter into a business relationship with the plaintiff.'" *B & M Linen Corp. v. Kannegiesser, USA, Corp.*, 679 F. Supp. 2d 474, 485 (S.D.N.Y. 2010). "Where a plaintiff alleges interference with a valid, enforceable contract . . . it is not necessary to allege that the interfere was malicious or done through wrongful means," but merely that it was done without justification. *Medtech Prods.*, 596 F. Supp. 2d at 798. "To determine whether interference is improper, courts consider the nature of the interfering conduct, the interest of the party being interfered with, and the relationship between the parties." *Yazurlo v. Bd. of Ed. of City of Yonkers*, No. 17 Civ. 2027, 2018 WL 4572255, at *5 (S.D.N.Y. Sept. 24, 2018) (citing *Guard-Life v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 190 (1980)).

The AC adequately alleges that Ezoic intentionally procured and caused breaches of the Publisher Agreements. As previously discussed, the nature of the Publishers' breaches--namely, that the Publishers breached their Agreements by removing Plaintiff's Content Recommendation Technology from their websites during the contractual term--is clearly set forth

in the AC. *See* AC ¶¶ 34-35, 52-54, 66, 77, 103-06. The AC also
alleges that Ezoic intentionally caused these breaches by
advising and instructing the Publishers to remove Taboola's
Content Recommendation Technology from their websites and to
replace them with competitors' content recommendation
technologies, as well as by taking active measures to implement
code in Ezoic's ad-testing platform that blocks Taboola's
technology from appearing on the Publishers' websites. *Id.* ¶
103. Additionally, Plaintiff has alleged that "[w]ere it not for
Ezoic's tortious acts, the Publishers would not have breached
the Publisher Agreements with Plaintiff." *Id.* ¶ 105.

The specific examples that Plaintiff has provided in
support of these allegations are sufficient to "nudge" its claim
"across the line from conceivable to plausible." *Iqbal*, 556 U.S.
at 679 (quoting *Twombly*, 550 U.S. at 570). For example,
Plaintiff alleges that Ezoic sent JGN an email explaining that
it did not "allow," and had taken measures to block, Taboola's
Content Recommendation Technology from appearing on JGN's
websites, and that Ezoic suggested that JGN replace Taboola with
Outbrain--a competitor of Taboola and a "certified partner" of
Ezoic. *See* AC ¶ 32, 49. Plaintiff also alleges that, after
Taboola declined to provide Ezoic with proprietary and
confidential information about its advertising practices,

SwinxSwing breached its agreement with Taboola as a direct
result of Ezoic's advice that SwingxSwing could increase its
profits by using other advertising technologies, such as
Outbrain. *See id.* ¶¶ 46-49. Plaintiff also alleges that the CEO
of Precision Creations informed Plaintiff that Ezoic implemented
code that automatically removed Taboola's Content Recommendation
Technology. *Id.* ¶¶ 63-64. Similar allegations were made
regarding Ezoic's interference with the TechSoft Agreement. *Id.*
¶ 72. Moreover, the AC alleges that Ezoic was intentionally
removing Taboola's technology from the Publishers' websites in
an effort to coerce Taboola's customers to switch to Outbrain, a
direct competitor of Taboola with whom Ezoic has a partnership.
*Id.* ¶ 31-32, 35, 47-49. Plaintiff further claims that Ezoic's
statements to the Publishers about the functionality of
Taboola's technology were baseless and false. *Id.* ¶ 64. Thus,
the facts as alleged contradict Ezoic's claims that it was
merely acting in concert with the Publishers, which had
previously and independently decided to breach their agreements
with Taboola, or that it was merely "acting to fulfill its own
obligations to the [Publishers] by ensuring its systems were
able to deliver the testing services for which [Publishers]
contracted with Ezoic." Defs.' Br. at 16-17. On the contrary,
Plaintiff has provided factual allegations supporting the notion
that Ezoic has taken continuous, affirmative steps to prevent

Taboola's Content Recommendation Technology from displaying on
the Publishers' websites, without justification for doing so. At
the motion to dismiss stage, this is enough to satisfy the third
element of a tortious interference with contract claim.

Furthermore, the AC fails to demonstrate that Ezoic is
entitled to the economic interest defense. A party may only
raise the economic interest defense when it was acting "to
protect its own *legal or financial stake in the breaching
party's business.*"[3] *White Plains*, 8 N.Y.3d at 426 (emphasis
added); *see also Dell's*, 887 F. Supp. 2d at 484 ("[T]he
[economic interest] defense . . . only applies when the alleged
interfering parties have acted to protect their interest in the
breaching party's business . . . -- not their own."). Here,
Defendants argue that their contractual relationship with the
Publishers created a legal or financial stake in the Publishers'
business. *See* Defs.' Br. at 11 n.5; Defs.' Reply Br. at 11.

---

[3]     To the extent Defendants contend that alleged interferers may invoke
the economic interest defense when they acted "to protect their own legal and
financial interest," as opposed to those of the Publishers, they misstate the
law. *See* Defs.' Br. at 17. This error apparently stems from Defendants'
reliance on *Don King Prods., Inc. v. Smith*, 47 F. App'x 12, 15 (2002). *Dong
King* is of no precedential value. *See White Plains Coat & Apron Co., Inc. v.
Cintas Corp.*, 460 F.3d 281, 288 n.1 (2d Cir. 2006) ("The district court
relied for authority on a summary order of this Court, *see Don King Prods,
Inc. v. Smith*, 47 F. App'x 12, 15 (2d Cir. 2002) . . . which should not have
been cited as precedential authority"). What is more, *Don King* "pre-dates the
New York Court of Appeals decision in *White Plains*, which confirmed the scope
of the economic interest defense." *Dell's Maraschino Cherries Co., Inc. v.
Shoreline Fruit Growers, Inc.*, 887 F. Supp. 2d 459, 484 n.27 (E.D.N.Y. 2012)
(citing *White Plains*, 8 N.Y.3d at 426).

However, the Court is not aware of any controlling case law in support of that proposition, nor do the Defendants cite to any. Further, even assuming *arguendo* that such contractual relations could constitute a legal or financial stake in the Publishers' business, nothing in the AC suggests that Ezoic acted to protect its interests in the Publishers' business. On the contrary, Plaintiff has alleged that Ezoic was using its contractual relationships to its *own* benefit, for instance by inducing the Publishers to replace Taboola with competitors, including Ezoic's alleged partner Outbrain. *See, e.g.*, AC ¶ 30-32, 35, 49, 103. In short, the AC fails to demonstrate that, as a matter of law, Ezoic is entitled to dismissal of the tortious interference claim based on the economic interest defense.

### 4. Taboola Has Alleged Damages

"Under New York law, a plaintiff in a tortious interference with contract case is entitled to damages in the amount of the full pecuniary loss of the benefits of the contract." *Design Partners, Inc. v. Five Star Electric Corp.*, 2017 WL 818364, at *15 n.18 (S.D.N.Y. Mar. 1, 2017) (citing *Int'l Minerals & Res., S.A. v. Pappas*, 96 F.3d 586, 587 (2d Cir. 1996)). Lost profits may fall under general damages or consequential damages, but different standards of proof apply

37

depending on the type of damages sought. *Biotronik A.G. v. Conor Medsystems Ireland, Ltd.*, 11 N.Y.3d 676, 680 (2014). "General damages are the natural and probable consequence of the breach of a contract" or are the "direct and immediate fruits of the contract entered into between the parties." *Id.* A non-breaching party seeks general damages when it seeks "only to recover money that the breaching party agreed to pay under the contract." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 109 (2d Cir. 2007). Lost profits are consequential damages when, as a result of the breach, the non-breaching party suffers loss of profits on collateral business arrangements. *Id.* "In New York, a party is entitled to recover this form of lost profits only if (1) it is demonstrated with certainty that the damages have been caused by the breach, (2) the extent of the loss is capable of proof with reasonable certainty, and (3) it is established that the damages were fairly within the contemplation of the parties." *Id.* (citing *Kenford Co. v. Cnty. of Eerie*, 67 N.Y.2d 257, 261 (1986)).

Taboola has alleged that lost profits were a "direct, proximate natural and foreseeable result" of the Publishers' breach of the Publishers Agreements. AC ¶ 107. This allegation is supported by the description of Taboola's business model and the purposes of entering into the Publisher Agreements. *See,*

*e.g.*, AC ¶¶ 13, 15-18-24, 37-38, 55-56. It is reasonable to infer based on these allegations that failure to display Taboola's Content Recommendation Technology would directly result in Taboola's loss of the advertising revenues that the technology, and the contracts licensing its used, were intended to generate. *See, e.g.*, *Biotronik A.G. v. Conor Medsystems Ireland, Ltd.*, 22 N.Y.3d 799, 807 (2014).

For the foregoing reasons, Defendants' motion to dismiss Plaintiff's tortious interference claim is denied.

## C. Taboola Has Stated a Claim for Breach of Contract

To state a breach of contract claim under New York law, the plaintiff must allege: "(1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages." *Long Beach Rd. Holdings, LLC v. Foremost Ins. Co.*, 75 F. Supp. 3d 575, 587 (E.D.N.Y. 2015) (quoting *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004)).

*1. Taboola Has Alleged the Existence of a Contract*

The provides several specific allegations to support the existence of a contract between Taboola and Ezoic. For example, Plaintiff alleges that Taboola and Defendants entered into an enforceable written contract that was executed on August 12, 2014 (the "Ezoic Agreement") by Lafleur both individually and on behalf of Ezoic. AC ¶ 78, 84, 109. The material terms of the Ezoic Agreement are alleged to be that: 1) Ezoic will display Taboola's Content Recommendation Technology on its website, internetslang.com, throughout the contractual term; and (2) Taboola and Ezoic will share the revenues that Taboola receives from third party websites to which viewers are redirected after clicking on a Recommendation on Ezoic's website, pursuant to a specified contractual formula. *Id.* ¶ 80. The AC also quotes provisions of the contract that required Ezoic to refrain from modifying or interfering with Taboola's technology or from disparaging Taboola. *Id.* ¶¶ 87-89. These provisions allegedly remained in effect during the term of the contract, *i.e.*, from August 2014 through August 2017. *Id.* ¶ 78-83. This is enough to plead the existence of the Ezoic Agreement. *See Fort Prods., Inc. v. Men's Med. Clinic, LLC*, No. 15 Civ. 376, 2016 WL 797577, at *3 (S.D.N.Y. Feb. 23, 2016) (denying motion to dismiss breach of contract claim where plaintiff alleged that defendant contracted with plaintiff for

40

marketing and advertising services and defendant agreed to pay a "fair and reasonable price" for plaintiff's services).

### 2. Taboola Has Alleged That It Performed Under the Ezoic Agreement

The AC alleges that the Ezoic Agreement required Taboola to provide its technology for Defendants' use and share advertising revenues derived from it, and in return Defendants were required to display Taboola's technology throughout the contractual term. AC ¶ 80. Taboola alleges that it performed its obligations under the Ezoic Agreement "by, among other things, providing and servicing the Content Recommendation Technology on the Publishers' websites and sharing advertising revenues with the Publishers as per the contractually specified formula in the Ezoic Agreement." *Id.* ¶¶ 110. Accordingly, the second element of Taboola's breach of contract claim has been adequately pled. *See Fort Prods.*, 2016 WL 797577, at *1-2 (plaintiff satisfied the performance element by alleging that it "performed marketing and advertising services for Defendant" during the contractual term, as required by the terms of the agreement).

### 3. Taboola Has Alleged That Ezoic Breached the Ezoic Agreement

The AC alleges that Defendants breached three specific provisions of the Ezoic Agreement requiring that: (1) Defendants

display Taboola's Content Recommendation Technology on their website, internetslang.com, during the contractual period of October 2014-August 2017, AC ¶¶ 86, 111; (2) Defendants refrain from engaging in "any action or practice that disparages or devalues Plaintiff, the Widget, the Taboola Sponsored Content, or the reliability, reputation, or goodwill of any of them" (the Non-Disparagement Clause), *id.* ¶¶ 32, 63-64, 89-90, 112; and (3) Defendants refrain from modifying, changing, editing, amending, truncating, altering, bypassing or reordering any aspect of Taboola's Content Recommendation Technology (the No Modification Clause), *id.* ¶¶ 89, 91, 113.

Contrary to Defendants' argument that the AC pleads facts that are "merely consistent" with Defendants' liability, Defs.' Br. at 23, the AC here pleads "factual content that allows the court to draw the reasonable inference" that Defendants are liable for the breaches alleged. *Iqbal*, 556 U.S. at 678.

With respect to the first provision, Taboola has clearly alleged that the Ezoic Agreement required Defendants to display Taboola's Content Recommendation Technology on its website, internetslang.com, throughout the contractual term, AC ¶ 80-81, and that Defendants breached this term when they

stopped displaying the Content Recommendation Technology in October 2014, *id.* ¶ 86. Defendants argue that it is "impossible to evaluate whether their conduct constituted a breach" of this provision because Taboola did not provide the exact text of the Ezoic Agreement requiring Defendants to display the Taboola technology on internetslang.com. Defs.' Br. at 23-24. However, as stated previously, Taboola is not required to attach the contract to the AC or plead its terms verbatim. *See Mayes*, 739 F. Supp. at 748. Instead, to plead the elements of a breach of contract claim, Taboola need only "identify what provisions of the contract were breached as a result of the acts at issue.'" *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162 (S.D.N.Y. 2011) (quoting *Wolff v. Rare Medium, Inc.*, 171 F. Supp. 2d 354, 358 (S.D.N.Y. 2001). That standard is satisfied here based on the allegations just described.

Breach of the Non-Disparagement Clause has also been adequately pled. The AC alleges that Ezoic breached the Non-Disparagement Clause by telling the Publishers that Taboola's product "is inferior to, and generates less advertising revenue than, competing products, including Outbrain." AC ¶ 90. It also claims that Ezoic told both JGN and Precision Creations that Taboola's product was malfunctioning by "randomly injecting ads"

43

on their webpages, causing a "bad user experience." *Id.* ¶¶ 32, 63. Taboola alleges that these comments were both baseless and false. *Id.* ¶ 64. Thus, Taboola has adequately stated a breach of the Non-Disparagement Clause.

Finally, the AC alleges that Defendants breached the No Modification Clause, which states that the Defendants cannot "modify, change, edit, amend, truncate, alter, bypass or reorder any aspect of [Taboola's] Widget or Recommendations," by configuring the Publishers' websites to bypass and/or not display Plaintiff's Content Recommendation Technology. *Id.* ¶¶ 88-89, 91. Although Defendants argue that this clause only applies to Ezoic's own website (and not to third party websites), *see* Defs.' Br. at 25, the AC specifically alleges that the text of this provision contains no such limitation to its scope. *See* AC ¶ 88. Nothing in the AC, including the quoted text of the No Modification Clause itself, contradicts this allegation. *See id.* ¶ 89. Accordingly, drawing all reasonable inferences in Taboola's favor, Taboola has alleged a breach of this provision.

> *4. Taboola Has Alleged Damages for Breach of Contract*

44

Taboola has alleged damages for Defendants' breach of contract in the form of advertising revenues that Taboola would have received had the contract been honored. *See id.* ¶ 114. Specifically, these damages consist of (1) revenues that Taboola would have received through Ezoic's interslang.com website had Ezoic not removed Taboola's technology, *id.* ¶ 111; and (2) revenues that Taboola would have received through the Publishers' websites had Ezoic not breached the No Modification and Non-Disparagement Clauses, *id.* ¶¶ 112-113.

As previously discussed, lost profits are recoverable as general damages for a breach of contract where they are "the natural and probable consequence of the breach" or the "direct and immediate fruits of the contract." *Biotronik*, 22 N.Y.3d 799 at 805-06. Here, Taboola has alleged that lost advertising revenues were "the direct, proximate, natural, and foreseeable result" of the breach, and this claim is supported by the factual allegations of the AC. *See, e.g.*, AC ¶¶ 13, 15-18-24, 37-38, 55-56, 67-68, 78, 80. As such, Taboola's lost profits claim cannot be dismissed at the pleading stage. *See, e.g., Nova Int'l, Inc. v. Am. Express Bank, Ltd.*, No. 94 Civ. 8536, 1996 WL 39317, at *8 (S.D.N.Y. Jan. 31, 1996) (lost profits element adequately stated where plaintiff alleged that such damages were

a "direct, proximate, and foreseeable consequence of [defendant's] breach").

Accordingly, Defendants' motion to dismiss the breach of contract claim is denied.

### D. Injunctive Relief Claim

"[A] request for permanent injunctive relief should not be dismissed at the pleading stage unless the underlying claim upon which relief is sought is dismissed." *Marino v. Nw. Mut. Life Ins. Co.*, 2001 WL 26574, at *3 (S.D.N.Y. Mar. 14, 2001) (citing *In re Lloyd's Am. Trust Fund Litig.*, 954 F. Supp. 656, 682 (S.D.N.Y. 1997)). Taboola seeks an injunction in connection with both its tortious interference claim and breach of contract claim with respect to the no modification and non-disparagement clauses. AC ¶ 119, Because those claims are not dismissed, *see supra* Parts IV.B-C, Taboola's injunction claim survives Defendants' motion to dismiss, as well.

### V. Conclusion

For the foregoing reasons, the Defendants' motion to dismiss is denied.

46

It is so ordered.

**New York, NY**
~~**January**~~     **, 2019**
*February 4*

_____
~~ROBERT W.~~ SWEET
U.S.D.J.