UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

TABOOLA, INC.,

                                        Plaintiff,

                    -v-

EZOIC INC. and DWAYNE LAFLEUR,

                                        Defendants.

---

17 Civ. 9909 (PAE) (KNF)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

Plaintiff Taboola, Inc., ("Taboola") brings this action for damages and injunctive relief against defendants Ezoic Inc. and its CEO Dwayne Lafleur (together, "Ezoic"), alleging, *inter alia*, tortious interference with four contracts that Taboola entered into with Internet website providers.  Dkt. 26 ("First Amended Complaint" or "FAC").  Ezoic denies these allegations and, in two amended counterclaims filed against Taboola, alleges that Taboola has tortiously interfered with *its* contracts.  Dkt. 54 ("counterclaims" or "ACC").

On June 21, 2019, Taboola moved to dismiss Ezoic's amended counterclaims.  Dkt. 56 ("MTD").  This Court referred the motion to the Honorable Kevin N. Fox, United States Magistrate Judge, for a Report and Recommendation.  *See* Dkt. 50.  Before the Court is Judge Fox's February 21, 2020 Report and Recommendation, Dkt. 63 ("Report"), Ezoic's objections, Dkt. 65 ("Objections"), and Taboola's response to those objections, Dkt. 66 ("Response").  The Report recommends that the Court grant Taboola's motion to dismiss Ezoic's amended counterclaims.  The Court adopts Judge Fox's recommendation, for the following reasons.

1

I.      **Background**[1]

The Court adopts the Report's detailed account of the facts and procedural history, to which no party objects. The following summary captures the limited facts necessary for an assessment of the issues presented.

     A.      **The Parties**

        1.      **Taboola**

Taboola is a provider of targeted digital advertising technology. FAC ¶ 12. It claims that its content recommendation technology, or "Widget," "reaches more than one billion [I]nternet users and offers more than 360 billion recommendations each month." *Id.* Taboola enters into agreements with Internet publishers, such as CBS, USA Today, and The Weather Channel, to serve as the exclusive provider of content recommendations on the websites and digital properties that the publisher owns or operates. *Id.* ¶ 13. Specifically, Taboola provides publishers with the code for its Widget, which recommends sponsored articles and advertisements that are custom-targeted to the website's visitors. *Id.* ¶ 14. This content, which Taboola funnels toward website visitors, may be provided by sponsoring advertisers, third-party publishers, or the website itself. *Id.* When a visitor clicks on a Taboola recommendation, she is directed to the website of the (third) party that paid for the distribution of the content. *Id.* ¶ 15. That party pays Taboola based on the number of times that visitors engage with, *i.e.*, click on, the sponsored content. *Id.* Taboola shares a percentage of these revenues with the publisher whose website prompted the visitor to engage with the promoted content. *Id.*

---

[1] The summary is drawn primarily from the Report, the FAC, and the ACC. For the purpose of resolving the motion to dismiss under Rule 12(b)(6), the Court assumes all well-pled facts to be true and draws all reasonable inferences in favor of Ezoic, the counterclaim-plaintiff. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

According to Ezoic, "Taboola is not a Google-Certified Publishing Partner or a Google Adsense Online-Certified Partner."  ACC ¶ 21.  As such, its advertisement practices need not comply with Google's strict policies regarding webpage content, click generation, and the amount of advertising content that can cover a publisher's webpage at any given time.  *Id.*

### 2.     Ezoic

Ezoic is a "creator and provider of artificial intelligence applications for website owners, brands, publishers, and bloggers (its 'Clients') to improve their websites' revenue by optimizing visitor experiences."  *Id.* ¶ 14.  Among Ezoic's services is its Ad Tester application, which evaluates different advertisement and webpage content layouts and optimizes them to improve visitor experience and increase a client's advertising revenue.  *Id.* ¶ 15.  The goal of the Ad Tester technology is to determine website layouts that will increase the amount of time spent by visitors on a client's webpage, thereby increasing the revenue generated through advertisements.  *Id.*

Unlike Taboola, Ezoic is a Google-Certified Publishing Partner and a Google Adsense Online-Certified Partner.  *Id.* ¶ 18.  To receive these certifications, Ezoic participated in Google's certified partner programs and consented to Google's Certified Publishing Partner Terms and Conditions, the Google Services Agreement, and the Google Adsense Online Certified Partner Program Agreement (together, the "Ezoic-Google Agreements").  *Id.*  As a certified partner, Ezoic can "use Google's 'Adsense' technology to create advertisements and generate advertisement revenue for its webpages."  *Id.*  However, the Adsense program comes with limitations:  Users may not, for example, use the technology on webpages that contain, *inter alia*, adult and mature content or misleading news; advertise those same webpages; or use the program to artificially generate advertisement "clicks."  *Id.* ¶ 19.  Adsense also may not be used on webpages composed of more than 50% advertisements or where the overall content of the page is otherwise low quality.  *Id.*

3

To access Ezoic's Ad Tester technology, Ezoic's clients must create an account, download the Ad Tester program, and agree to Ezoic's Terms of Service, which are publicly available on its website. *Id.* ¶ 16. Clients can generate advertisements for their websites by leveraging any of the 300 advertising networks with which Ezoic maintains partnerships, or any other advertising network, as long as it is Google-Certified and compliant with Ezoic's Terms of Service. *Id.* ¶ 17.

Ezoic alleges that its status as a Google-Certified Partner renders its Ad Tester technology incompatible with Taboola's Widget. *Id.* ¶ 23. In other words, even if Ezoic's clients are otherwise compliant with Google's Adsense requirements, the installation of Taboola's widget on a client's website, Ezoic claims, can put both the client and Ezoic in breach of Ezoic's agreements with Google. *Id.* This can lead to fines and the permanent termination of a website from Google's Adsense program. *Id.*

### B.    The "Client" or "Publisher" Contracts

Ezoic's first counterclaim concerns Ezoic's and Taboola's dealings with five website operators, which Ezoic refers to as "clients" and Taboola refers to as "publishers." These entities are: Média Sur 7, SwingxSwing, 24 Minutes, Muhanfeed, and Popdust (the "Clients").

#### 1.    Média Sur 7

Ezoic alleges that it entered into an "agreement"[2] with Média Sur 7 ("Ezoic-Média Sur 7 Agreement") on March 26, 2018. *Id.* ¶ 25. Ezoic alleges that "[a]lmost immediately" after going live with its application on May 11, 2018, Média Sur 7 began receiving threatening calls from Taboola, prompting it to remove Ezoic's software from its website six days later. *Id.* ¶¶ 27–28. Ezoic does not allege that Taboola mentioned Ezoic's application, or Média Sur 7's contractual

---

[2] Perhaps tellingly, Ezoic does not refer to its asserted agreements with its clients as "contracts" in its factual allegations.

obligations with Ezoic, in its communications with Média Sur 7.  However, Ezoic points to an exchange that it had with Média Sur 7 in which the client claimed that it "cut [its advertising] level because [it] got a new phone call from [an] account manager at Taboola, they are threatening, can you cut off immediately?  [A]ll the advertisements that you broadcast on the site st[o]p." *Id.* ¶ 30.  Ezoic alleges that "[b]ut for Taboola's tortious interference, Média Sur 7 would not have breached the Ezoic[-]Média Sur 7 Agreement.  Média Sur 7 no longer utilizes Ezoic's services." *Id.* ¶ 34.

### 2. SwingxSwing

SwingxSwing (also referred to in the counterclaims as "SwingbySwing") is the only client that is discussed in both Taboola's FAC and Ezoic's amended counterclaims.  The parties' factual allegations are, in part, contradictory.  The parties do not dispute, however, that, on April 23, 2014, Taboola entered into an agreement with SwingxSwing, and that, approximately two years later, on May 11, 2016, Ezoic entered into an agreement with SwingxSwing (the "Ezoic-SwingxSwing Agreement").  *See* FAC ¶ 37; ACC ¶ 35.

According to Taboola, SwingxSwing removed its Widget on March 17, 2017, approximately one year after going live with Ezoic's Adsense technology.  FAC ¶¶ 43–44.  This, according to Taboola, violated SwingxSwing's agreement with Taboola, which "required [SwingxSwing] to display Taboola's [Widget] on its websites, . . . prohibited [it from] . . . using content recommendation technologies belonging to Taboola's competitors," and "remained in effect until April 23, 2018."  *Id.* ¶¶ 39–41.  SwingxSwing's CEO informed Taboola that it "had decided to stop using [Taboola] as the result of a recommendation from Ezoic" and that SwingxSwing "did not wish to display [Taboola's Widget] . . . because it would prevent Ezoic from testing whether

displaying other ads in that same space would be more profitable."[3]  *Id.* ¶ 46.  In a later email, SwingxSwing informed Taboola that it had "handed all inventory over to Ezoic" and that Ezoic was "testing [SwingxSwing's] inventory with its own certified partners."  *Id.* ¶ 48.  This culminated, according to Taboola, with SwingxSwing "impermissibly seeking to terminate its contract with [Taboola] ten months early," by way of a letter that noted it had "engaged a consultant [Ezoic] to advise" it regarding Taboola's services.  *Id.* ¶ 51.  To enforce its contractual rights, Taboola commenced this action on December 19, 2017.  Dkt. 1.

Ezoic disputes this characterization of events.  Ezoic alleges that it entered into an "agreement" with SwingxSwing in May 2016, ACC ¶ 35, and that in May 2017, a year after it began using Ezoic's application, SwingxSwing began receiving emails from Taboola requesting that it re-install Taboola's Widget, *id.* ¶ 37.  Ezoic further alleges that Taboola threatened a lawsuit against SwingxSwing if it continued to use Ezoic's technology.  *Id.* ¶ 39.  On July 9, 2018, SwingxSwing removed Ezoic's application from its website, which, according to Ezoic, constituted a violation of the Ezoic-SwingxSwing Agreement.  *Id.* ¶ 40.  Ezoic alleges that "[b]ut for Taboola's tortious interference, Swing[x]Swing would not have breached the Ezoic[-]Swing[x]Swing Agreement.  Swing[x]Swing no longer utilizes Ezoic's services."  *Id.* ¶ 44.

### 3.    24 Minutes

On April 13, 2016, 24 Minutes Ltd. ("24 Minutes") entered into an "agreement" with Ezoic ("Ezoic-24 Minutes Agreement").  *Id.* ¶ 46.  Ezoic alleges that "sometime after April 2016, 24 Minutes began using Taboola's Widget," *id.* ¶ 48, and that "[o]n October 14, 2016, Ezoic received notice from Google that 24 Minutes was in violation of Google's Adsense Advertising Policies and, as a result, was being fined $230,000 and permanently banned from

---

[3] An excerpt of this email is provided in Taboola's First Amended Complaint.  *See* FAC ¶ 47.

Google's Adsense program," *id.* ¶ 49.  The conduct that prompted Google's response—which included excessive use of webpage space for ads, a layout that encourages accidental or deceptive clicks, and the use of on-page and full-page pop-ups redirecting users to other sites—breached the Ezoic-24 Minutes Agreement, which required 24 Minutes to accept and comply with Google's Adsense policies.  *Id.* ¶¶ 49–50; *see id.* ¶ 55.  Ezoic alleges that the breach is directly attributable to 24 Minutes' use of Taboola's widget.  *Id.* ¶ 51.  Ezoic alleges that "[b]ut for Taboola's tortious interference, 24 Minutes would not have breached the [Ezoic-]24 Minutes Agreement.  24 Minutes no longer utilizes Ezoic's services."  *Id.* ¶ 57.

Ezoic claims that 24 Minutes is actively suing Google in Israel to recover the $230,000 fine and to renew its access Google's advertising platform.  *Id.* ¶ 52.  Ezoic alleges that, if 24 Minutes prevails, Google "may demand indemnification or reimbursement" from Ezoic for this amount under the terms of the Ezoic-Google Agreements.  *Id.* ¶ 58.

### 4.      Muhanfeed

Muhanfeed.com ("Muhanfeed") entered into an "agreement" with Ezoic on August 28, 2016 (the "Ezoic-Muhanfeed Agreement") and launched Ezoic's advertising application.  *Id.* ¶ 62.  Ezoic alleges that on November 24, 2016, it received a warning from Google that Muhanfeed was in violation of Google's Adsense Advertising policies.  *Id.* ¶ 64.  After conducting its own investigation of Muhanfeed's site, Ezoic discovered that it contained "adult and mature advertising content," ads that had been "scraped or copied" from other websites, and an unsatisfactory ad-to-content ratio.  *Id.* ¶ 65.  Ezoic contends that each of these practices, which violated Google's Adsense Advertising Policies, were attributable to Muhanfeed's use of the Taboola widget.  *Id.* Ezoic alerted Muhanfeed to the policy violation and to Taboola's alleged role in causing it.  *Id.* ¶ 66.  However, Muhanfeed failed to correct the violation, prompting Google to ban Muhanfeed from its Adsense program and prompting "Ezoic [to] terminate[] its relationship with

Muhanfeed." *Id.* ¶ 67.  Ezoic alleges that "[b]ut for Taboola's tortious interference, Muhanfeed would not have breached the Ezoic[-]Muhanfeed Agreement.  Muhanfeed no longer utilizes Ezoic's services." *Id.* ¶ 72.

### 5.    Popdust

On August 14, 2018, Popdust entered into an "agreement" with Ezoic (the "Ezoic-Popdust Agreement") and launched Ezoic's advertising application.  *Id.* ¶ 76.  Ezoic alleges that, on April 30, 2019, it received a "disablement notice" for two Popdust websites based on Popdust's violations of Google's Adsense Advertising Policies.  *Id.* ¶ 78.  After reaching out to Google for more information, Ezoic discovered that Popdust's sites contained adult content and excessive "sponsored link" advertisements.  *Id.* ¶ 79.  Google also informed Ezoic that Popdust was utilizing Taboola's widget, which had placed the unacceptable ad content on the site.  *Id.*  Ezoic alleges that "[b]ut for Taboola's tortious interference, Popdust would not have breached the Ezoic[-]Popdust Agreement.  Popdust no longer utilizes Ezoic's services." *Id.* ¶ 84.

## C.    Ezoic's Counterclaims

Ezoic brings two counterclaims against Taboola.  First, it alleges that Taboola tortiously interfered with Ezoic's contracts with each of the above clients (together, the "Ezoic-Client Agreements").  *Id.* ¶¶ 88–95.  Second, it alleges that Taboola tortiously interfered with Ezoic's own contract with Google, *i.e.*, the Ezoic-Google Agreements.  *Id.* ¶¶ 96–102.

### 1.    Tortious Interference with the Ezoic-Client Agreements

The basis for Ezoic's first claim of tortious interference is its contention that, by downloading and launching Ezoic's Ad Tester application, each client entered into a "valid and enforceable

8

contract[]" with it.[4]  *See id.* ¶ 89.  Ezoic alleges that the terms of these contracts were "substantially

identical" to Ezoic's publicly available "Terms of Service."  *See id.* ¶¶ 25, 35, 46, 62, 76.  Ezoic

further contends that "Taboola was aware and had actual knowledge of the existence and

material terms of the Ezoic[-]Client Agreements" from "its own conversations with the Clients"

and because the material terms were "substantially identical to the publicly available Ezoic

Terms of Service on Ezoic's website."  *Id.* ¶ 91.  According to Ezoic, "Taboola directly and

intentionally caused the Clients to breach the Ezoic[-]Client Agreements" by "using threats to

force them to use Taboola's Widget."  *Id.* ¶ 92.  But for Taboola's actions, Ezoic alleges, its

Clients would not have done so, and Ezoic would not have suffered damages in the form of lost

advertising revenues.  *Id.* ¶ 95.

## 2.  Tortious Interference with the Ezoic-Google Agreements

Ezoic's second counterclaim alleges that Taboola tortiously interfered with Ezoic's own

agreements with Google, by causing 24 Minutes, Muhanfeed, and Popdust to violate the terms of

Google's Adsense Advertising Policies while running Ezoic's software.  *Id.* ¶ 100.  Ezoic alleges

that Taboola's interference with the Ezoic-Client Agreements had the follow-on effect of forcing

*Ezoic itself*, not a third party, to breach its own agreements with Google, because the Ezoic-Google

Agreements require Ezoic to ensure its clients' compliance with Google's Adsense Advertising

---

[4] As summarized by Ezoic, the agreements each provide, among other terms, that "(1) [Client] will give Ezoic access to its webpages for purposes of placing advertisements or network code on its website; (2) [Client] will not reverse engineer, decompile, or disassemble the [Ezoic] Service or any software made available to it from Ezoic; (3) Ezoic will provide Services including, but not limited to, analytics tools, reporting and optimization tools and services; and (4) [Client] will accept and comply with the Google Adsense Advertising Policies outlined at https://www.google.com/adsense/policies."  *See* ACC ¶¶ 26, 36, 47, 63, 77 (internal quotation marks omitted).  According to Ezoic, the agreements "do[] not permit [Client] to terminate the agreement at will.  [The Client] may 'request' termination of the Ezoic-[Client] Agreement.  But under the terms of the Ezoic-[Client Agreement], Ezoic retains the power to grant or deny [Client's] request, in Ezoic's sole discretion."  *Id.*

Policies.  *Id.*  Taboola, Ezoic alleges, "was aware and had actual knowledge of the existence and material terms of the Ezoic[-]Google Agreements."  *Id.* ¶ 99.  Ezoic alleges that Taboola knew this from (1) its own efforts to inform Taboola of the contract and its content;[5] (2) Google's publicized partnership with Ezoic;[6] (3) Taboola's familiarity with the online advertising industry, "where it is well known that Ezoic is a Google-certified partner"; and (4) Ezoic's publication of its Google-Certified Partner status on its website.  *Id.* ¶ 99.  But for Taboola's actions, Ezoic argues, the Ezoic-Google Agreements would still be intact and Ezoic would not face damages in the form of Google-imposed fines or court-ordered indemnity in connection with the Google-24 Minutes litigation.  *Id.* ¶ 102.

## II.    Applicable Legal Standards

### A.    Report and Recommendation

In reviewing a Report and Recommendation, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).  When specific objections are made, "[t]he district judge must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3); *United States v. Male Juvenile*, 121 F.3d 34, 38 (2d Cir. 1997).  To

---

[5] These efforts included an email from LaFleur to Taboola's Publisher Optimization Manager and its Business Development & Publisher Sales Manager regarding the incompatibility of Taboola's advertising practices and Ezoic's policies as a Google Adsense partner, as well as "multiple conversations with individuals at Taboola about Ezoic's partnership with Google." ACC ¶ 59.  These conversations allegedly communicated "Ezoic's responsibilities under the Ezoic[-]Google Agreements to comply with Google's advertising policies and Ezoic's responsibilit[y] [to] ensur[e] that its Clients also comply with Google's policies."  *Id.*

[6] According to Ezoic, it "publicizes on its website that it is a Google-Certified Publishing Partner and a Google-Adsense-Certified Partner, and that its responsibilities for both include 'ensur[ing] Google policy compliance' for its Clients.  Ezoic is listed as a Google partner on the Google partner portal, which states that 'Ezoic helps publishers improve monetization, provide better visitor experiences, and remain compliant with Google policy.'"  *Id.* ¶ 60.

accept those portions of the report to which no timely objection has been made, "a district court need only satisfy itself that there is no clear error on the face of the record." *King v. Greiner*, No. 02 Civ. 5810 (DLC), 2009 WL 2001439, at *4 (S.D.N.Y. July 8, 2009) (citing *Wilds v. UPS*, 262 F. Supp. 2d 163, 169 (S.D.N.Y. 2003)), *aff'd*, 453 F. App'x 88 (2d Cir. 2011); *see also Edwards v. Fischer*, 414 F. Supp. 2d 342, 346–47 (S.D.N.Y. 2006) (citation omitted).

To the extent that the objecting party makes only conclusory or general objections, or simply reiterates the original arguments, the court will review the Report and Recommendation strictly for clear error. *See Dickerson v. Conway*, No. 08 Civ. 8024 (PAE), 2013 WL 3199094, at *1 (S.D.N.Y. June 25, 2013); *Kozlowski v. Hulihan*, Nos. 09 Civ. 7583, 10 Civ. 0812 (RJH), 2012 WL 383667, at *3 (S.D.N.Y. Feb. 7, 2012).

Here, Judge Fox recommends that this Court dismiss both of Ezoic's counterclaims in their entirety. *See* Report at 16. Ezoic objects to Judge Fox's analysis of each prong of the *prima facie* case of tortious interference, as applied to both (1) the Ezoic-Client Agreements and (2) the Ezoic-Google Agreements. *See* Objections. These objections were timely raised and do not merely repeat Ezoic's original arguments. The Court therefore considers the issues presented *de novo*.[7] Fed. R. Civ. P. 72(b)(3).

---

[7] In its Objections, Ezoic argues, *inter alia*, that Judge Fox erred because he impermissibly held its amended counterclaims to a higher standard than Judge Sweet had held Taboola's FAC when deciding Ezoic's motion to dismiss. Ezoic contends that this was contrary to the law of the case. Ezoic is incorrect. "Under the law of the case doctrine, a decision on an issue of law made at one stage of a case becomes binding precedent to be followed in subsequent stages of the same litigation." *In re PCH Assocs.*, 949 F.2d 585, 592 (2d Cir. 1991). No judge prior to Judge Fox, however, had decided whether Ezoic's amended counterclaims allege sufficient facts to make out a prima facie case. In any event, the "doctrine is a discretionary rule of practice and generally does not limit a court's power to reconsider an issue." *Id.*

### B.  Motions to Dismiss Under Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.  When resolving a motion to dismiss, the court must accept as true all well-pled factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor.  *Steginsky v. Xcelera, Inc.*, 741 F.3d 365, 368 (2d Cir. 2014).  That tenet, however, "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.  Pleadings that offer only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

### C.  Tortious Interference: Elements and Choice of Law

In a footnote in its opposition to Taboola's motion to dismiss its amended counterclaims, Ezoic asserts that its client contracts are governed by California, not New York, law, although it argues that its position is correct under New York law as well.  Dkt. 58 ("MTD Opp'n") at 16 n.8.  It renews this position, albeit fleetingly, in its Objections to the Report.  Objections at 8.[8]

"The first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved." *Matter of Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 223 (1993); *see also Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998).  An "actual conflict" exists where "the applicable law from each

---

[8] Ezoic argues the rest of its Objections to the Report under New York law.

jurisdiction provides different substantive rules" and those differences are "relevant to the issue at hand[ ] and . . . have a significant possible effect on the outcome of the trial." *Fin. One Pub. Co. v. Lehman Bros. Special Fin.*, 414 F.3d 325, 331–32 (2d Cir. 2005) (citations and internal quotation marks omitted).  "While the Court need not determine if a conflict of law would be outcome determinative, if a court finds that the effect would be the same under either state's law, there is no actual conflict." *Allied Prop. & Cas. Ins. Co. v. Matthews*, No. 16 Civ. 680 (DAB), 2018 WL 1737534, at *5 (S.D.N.Y. Mar. 20, 2018) (internal quotation marks omitted).  "Absent an actual conflict, 'a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it.'"  *Id.* at *6 (quoting *Int'l Bus. Machs. Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004)); *see also Wall v. CSX Transp., Inc.*, 471 F.3d 410, 422 (2d Cir. 2006); *First Hill Partners v. BlueCrest Capital Mgmt. Ltd.*, 52 F. Supp. 3d 625, 633–34 (S.D.N.Y. 2014).

To make out a prima facie case of tortious interference with contract under California law, a plaintiff must allege sufficient facts to establish: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 55 (1998).  As discussed *infra*, these match the elements of the tort under New York law.  And Ezoic asserts that its counterclaims are equally viable under each state's law.  Because there is not an actual conflict of law, the Court will therefore apply New York law to resolve Taboola's motion to dismiss.  *See Int'l Bus. Machs. Corp.*, 363 F.3d at 143.

"While New York law recognizes the tort of interference with both prospective and existing contracts, greater protection is accorded an interest in an existing contract . . . than to the

less substantive, more speculative interest in a prospective relationship[.]" *In Touch Concepts, Inc. v. Cellco P'ship*, 949 F. Supp. 2d 447, 476 (S.D.N.Y. 2013) (internal quotation marks omitted) (quoting *White Plains Coat & Apron Co. v. Cintas Corp.*, 8 N.Y.3d 422, 425–26 (2007)). "This rule represents a balance struck between society's interest in respect for the integrity of contractual relationships, on the one hand, and, on the other, the right to freedom of action on the part of the party [alleged to be] interfering and society's concern that competition not be unduly hampered." *NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 87 N.Y.2d 614, 621–22 (1996) (quoting *Guard-Life Corp. v. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 190 (1980)).

"Under New York law, the elements of tortious interference with contract are: (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401–02 (2d Cir. 2006) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996)). "In addition, the plaintiff must assert, with respect to each defendant, that the defendant's actions were the 'but for' cause of the alleged breach—in other words, that there would not have been a breach but for the activities of the defendant." *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 405 (S.D.N.Y. 2009) (citing *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 828 (2d Cir. 1990)), *aff'd*, 387 F. App'x 72 (2d Cir. 2010); *see also White Plains Coat & Apron Co. v. Cintas Corp.*, 460 F.3d 281, 285 (2d Cir. 2006) ("[W]hen there is knowledge of a contract, and a competitor takes an active part in persuading a party to the contract to breach it by offering

better terms or other incentives, there is an unjustifiable interference with the contract." (quoting *State Enters., Inc. v. Southridge Co-op. Section 1, Inc.*, 238 N.Y.S.2d 724, 726 (1st Dep't 1963)).

## III.   Discussion

Taboola has moved to dismiss Ezoic's counterclaims for failure to plead sufficient facts to make out a *prima facie* case of tortious interference.  The Court begins by considering Ezoic's first counterclaim, that Taboola tortiously interfered with the Ezoic-Client Agreements.  The Court then considers Ezoic's second counterclaim, which alleges that Taboola tortiously interfered with the Ezoic-Google Agreements by virtue of its actions as to the 24 Minutes, Muhanfeed, and Popdust websites.

### A.   Counterclaim for Tortious Interference with the Ezoic-Client Agreements

Ezoic alleges that Taboola tortiously "instructed at least five of [its] Clients"—Média Sur 7, SwingxSwing, 24 Minutes, Muhanfeed, and Popdust—"to breach their contracts with [Ezoic] by removing Ezoic's application from their website[,]" ACC ¶ 24, "demand[ed] that these clients cease working with Ezoic[,] and improperly threaten[ed] [them] with legal action should they continue to work with Ezoic and comply with Google's advertising policies," *id.* ¶ 6.  Taboola did so, Ezoic alleges, with "full knowledge that it would cause the Clients to violate their agreements with Ezoic, causing significant damages."  *Id.* ¶ 24.  Ezoic further alleges that, instigated by Taboola, Ezoic's Clients "have breached and/or purported to terminate their agreements with Ezoic."  *Id.* ¶ 6.

#### 1.   Existence of a Valid Contract

"A central requirement for [claiming tortious interference] under New York law is the existence of a valid, enforceable contract between the plaintiff and a third party."  *Scutti Enters., LLC v. Park Place Entm't Corp.*, 322 F.3d 211, 215 (2d Cir. 2003).  Because a properly pled tortious interference complaint also requires a showing of breach, contracts that are terminable at

15

will generally cannot provide the basis for such a claim.  *See AIM Int'l Trading, LLC v. Valcucine S.p.A.*, No. 02 Civ. 1363 (PKL), 2003 WL 21203503, at \*5 (S.D.N.Y. May 22, 2003) (citing *Guard-Life Corp.*, 50 N.Y.2d at 193–94); *see also Watts v. Jackson Hewitt Tax Serv. Inc.*, 675 F. Supp. 2d 274, 281 (E.D.N.Y. 2009) (citing *Snyder v. Sony Music Entm't Inc.*, 684 N.Y.S.2d 235, 239 (1st Dep't 1999) ("[A]greements that are terminable at will are classified as only prospective contractual relations, and thus cannot support a claim for tortious interference with existing contracts."); *Orange Cty. Choppers, Inc. v. Olaes Enters., Inc.*, 497 F. Supp. 2d 541, 562 (S.D.N.Y. 2007) (dismissing claim where allegations left open possibility that contract was terminable at will).

Where the means employed to induce the breach are "wrongful," however, the valid contract prong of a tortious interference claim may be satisfied by an at-will contract.  *See Guard-Life Corp.*, 50 N.Y.2d at 194 ("Where contracts terminable at will have been involved, we have upheld complaints and recoveries in actions seeking damages for interference when the alleged means employed by the one interfering were wrongful as consisting of fraudulent representations, or threats[,] or as in violation of a duty of fidelity owed to the plaintiff by the defendant by reason of a relation of confidence existing between them." (internal citations omitted)).

Ezoic alleges that its clients downloaded its Ad Tester application and, by doing so, entered into contracts that were "the same or substantially similar to" its publicly available Terms of Service.  *See* ACC ¶¶ 25, 35, 46, 62, 76; *see also supra* note 4.  These contracts,

however, appear terminable at will by either party.[9]  *See* Dkt. 57 (declaration of Mark Cuccaro, Esq., in support of Taboola's motion to dismiss), Ex. 1 ("Ezoic TOS") ¶ 15 ("Cause for such termination shall include . . . self-initiated account deletions.").  Moreover, they do not appear to create contracts of fixed duration.  *See id.* ¶ 6 ("In the event the Agreement is terminated, Ezoic shall pay Payee's earned balance to Payee within approximately ninety (90) days after the end of the calendar month *in which the Agreement is terminated by you* (following Ezoic's receipt of your written request, including by email, to terminate the Agreement) *or by Ezoic*." (emphasis added)).

Ezoic, however, argues that the language of the Terms of Service does not permit a client to terminate an agreement without requesting Ezoic's permission to do so.  *See* ACC ¶¶ 26, 36, 47, 63, 77 ("[T]he Ezoic[-Client] Agreement does not permit [Client] to terminate the agreement at will.  [Client] may 'request' termination of the Ezoic[-Client] Agreement.  But under the terms of the Ezoic[-Client] Agreement, Ezoic retains the power to grant or deny [Client]'s request, in Ezoic's sole discretion.").  Ezoic further argues that even if the contractual language on this point is ambiguous, Taboola used "wrongful means" to procure the breach by threatening to sue Ezoic's clients if they continued to work with Ezoic.  *See id.* ¶¶ 6, 24, 28, 30, 37–40, 92; Objections at 9.

---

[9] "A complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."  *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (internal quotation marks and citations omitted) (collecting cases).  Even "[w]here a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document 'integral' to the complaint."  *Id.*; *DiFolco*, 622 F.3d at 111; *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006).  Such is the case here for the Ezoic-Client Agreements.  *See* ACC ¶¶ 25, 35, 46, 62, 76.

Ezoic's first argument is clearly unavailing.  As Taboola points out, it would be nonsensical to read the Terms of Service as "requiring a Publisher to pay Ezoic in perpetuity unless Ezoic agrees otherwise."  *See* Response at 7.  Ezoic's second argument, in which it invokes the "wrongful means" exception, presents a closer question.  Drawing all reasonable inferences in favor of the counterclaim plaintiff, Ezoic has pled the bare minimum needed to allege repeated threats to its clients by Taboola.  *See* ACC ¶¶ 6, 24, 28, 30, 37–40, 92.  Taboola responds that under New York law, the "wrongful means" exception applies only to claims of tortious interference with *prospective* contracts, which it asserts is a "separate cause of action." *See* Response at 8.  The case relied upon by Taboola, however, does not treat interference with a terminable at-will contract as a distinct tort, but rather a subspecies of the tort of interference in contracts.  *Guard-Life Corp.*, 50 N.Y.2d at 194.

The Court need not resolve this debate.  Even assuming *arguendo* that Ezoic's allegations of threats to its clients by Taboola provide a sufficient basis to find tortious interference with the at-will agreements at issue, this counterclaim, as the Court now reviews, fails on two other, independent grounds.

### 2.    Actual Breach of the Contract

To make out the second element of a tortious interference claim, Ezoic must plead sufficient facts to establish an actual breach of the Ezoic-Client Agreements.  "The Second Circuit has adopted a formalistic approach to determining whether a plaintiff has properly alleged breach of a contract in a tortious interference claim."  *RSM Prod. Corp.*, 643 F. Supp. 2d at 409 (citing *Kirch*, 449 F.3d at 402).  Notable here, the Circuit has applied this approach to affirm the dismissal of a tortious interference with contract claim on the basis that "plaintiffs fail[ed] to allege . . . actual breach" of a contract when the complaint alleged that the contracting

party had "walked away" from a project, because such statements do "not amount to an allegation that [the contracting party] violated the terms of a contract." *Kirch*, 449 F.3d at 402.

In its Objections, Ezoic maintains that its first counterclaim does allege that its Clients breached their contracts. Ezoic points, for example, to its allegation that "[b]ut for Taboola's tortious interference, Média Sur 7 would not have breached the Ezoic-Média Sur 7 Agreement. Média Sur 7 no longer utilizes Ezoic's services." ACC ¶ 34; *see also* Objections at 10–11. But Ezoic does not develop that claim further. And its unadorned allegation that Média Sur 7 "breached" the contract, without any factual support, is a bare legal conclusion that cannot make a claim of breach plausible.

Ezoic's allegation that Média Sur 7 "no longer utilizes Ezoic's services" also does not viably plead a breach, for multiple reasons. First, the underlying agreements, as noted, appear to have been terminable at will. As a result, Ezoic's allegation that Média Sur 7, like the other Clients referenced in its counterclaims, "no longer utilize[s] Ezoic's services," carries no more bite than an allegation that its clients "walked away." *See Kirch*, 449 F.3d at 402. Second, even if the contracts were not at-will agreements, a client's decision to no longer use a product does not, without more, make out a breach of contract. Ezoic's tortious interference claim, therefore, fails to plead actual breach of the contract between it and Média Sur 7. And because Ezoic's allegations of breach as to its other Clients track those with respect to Média Sur 7, these, too, cannot sustain a claim of tortious interference.

### 3. Actual Knowledge of the Contract

Independently, although the question is closer, the Court holds that Ezoic has failed to adequately plead that Taboola had actual knowledge of Ezoic's client agreements.

To satisfy this element of tortious interference, Ezoic must plead facts showing not only that Taboola had knowledge of the existence of a contract, but that it had "actual knowledge of

the terms of the contract and of the contractual obligation that was allegedly breached." *See*

*Wellington Shields & Co. LLC v. Breakwater Inv. Mgmt. LLC*, No. 14 Civ. 7529 (RJS),

2016 WL 5414979, at \*4 (S.D.N.Y. Mar. 18, 2016) (citing *Roche Diagnostics GmbH v. Enzo*

*Biochem, Inc.*, 992 F. Supp. 2d 213, 221 (S.D.N.Y. 2013)); *see also AA Tube Testing Co. v.*

*Sohne*, 246 N.Y.S.2d 247, 248 (2d Dep't 1964) ("As an essential element of [tortious

interference], the plaintiff must allege that the defendants had *actual* knowledge; an allegation

that they 'should have known' of the existence of the contract is insufficient." (emphasis in

original)).

 To be sure, a party claiming tortious interference need not show that the interfering party

had "perfect knowledge of the contract." *Reach Music Pub., Inc. v. Warner/Chappell Music,*

*Inc.*, No. 09 Civ. 5580 (KBF), 2014 WL 5861984, at \*10 (S.D.N.Y. Nov. 10, 2014). But "[t]he

plaintiff must [plead] specific allegations of the defendant's knowledge" of the contract, *Medtech*

*Prods. Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 813 (S.D.N.Y. 2008), including "some

knowledge of the terms and conditions of the allegedly-interfered-with contract," *State St. Glob.*

*Advisors Tr. Co. v. Visbal*, No. 19 Civ. 1719 (GWH), 2020 WL 71162, at \*17

(S.D.N.Y. Jan. 3, 2020); *see also Wellington Shields & Co. LLC*, 2016 WL 5414979, at \*4

(plaintiff must plead sufficient facts to establish "actual knowledge of the terms of the contract

and of the contractual obligation that was allegedly breached"); *Reach Music Pub., Inc.*,

2014 WL 5861984, at \*10 ("Even though knowledge of the contract need not be perfect,

[defendant] must have knowledge of the [relevant term] in order to be liable for helping [the

third party] violate that particular contractual provision.").

 Such specific allegations may not consist of "conclusory assertion[s] of knowledge," *see*

*Medtech Prods.*, 596 F. Supp. 2d at 813, or pleadings based solely on "information and belief,"

*see Citizens United v. Schneiderman*, 882 F.3d 374, 384–85 (2d Cir. 2018) ("A litigant cannot merely plop 'upon information and belief' in front of a conclusory allegation and thereby render it non-conclusory.  Those magic words will only make otherwise unsupported claims plausible when 'the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible.'" (quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)).  Claims that a defendant should have known about a contract or its terms "as a matter of course" or based on "common practice" within an industry are similarly insufficient, *see AA Tube Testing Co.*, 246 N.Y.S.2d at 248, as are allegations based on the public availability of the underlying contract, *see Roche Diagnostics*, 992 F. Supp. 2d at 221 (fact that contract was published in a quarterly filing was "inadequate to demonstrate [actual] knowledge for purposes of tortious interference").

Ezoic construes its amended counterclaims to allege six sources of Taboola's ostensible "actual knowledge": (1) Taboola's alleged discussions with each of these clients, *see* ACC ¶¶ 31, 41, 54, 68, 80; (2) Média Sur 7 and SwingxSwing's additional communications with Taboola about using Ezoic's Ad Tester, *see id.* ¶¶ 30, 37–40; (3) Ezoic's publicly available Terms and Conditions (which provided its form contract), *see id.* ¶¶ 31, 41, 54, 68, 80; (4) its Clients' websites, which run Ezoic's code, *see id.* ¶¶ 30, 37, 60; (5) the communications of Ezoic's CEO with Taboola as early as October 2014, *see id.* ¶¶ 59–60; and (6) as to its claim of tortious interference in its agreement with Popdust, Ezoic's original counterclaims, which were filed before Taboola allegedly interfered with that client.  *See id.* ¶ 80.

The Court considers these in turn, finding that, notwithstanding the length of Ezoic's laundry list of sources of knowledge, it has failed to plead non-speculatively that—separately or

together—these sources informed Taboola about the specific agreements at issue and the obligations contained therein.

First, while Taboola's direct communications with the clients could in theory supply a basis for its knowledge of the contracts between them and Ezoic, Ezoic's counterclaim does not set out facts to adequately so plead.  It is not enough for Ezoic to baldly state that "upon information and belief [Client] discussed the material terms of the [Ezoic-Client] Agreement with Taboola"; a concrete factual foundation for such assertions is needed.  *See In re Actos End-Payor Antitrust Litig.*, 848 F.3d 89, 99 (2d Cir. 2017) (at motion to dismiss stage, "[p]laintiffs are due all reasonable inferences, but they must allege some factual basis from which to make those inferences").  Here, Ezoic makes only highly generalized and wholly conclusory claims as to the content of Taboola's conversations with its clients.  Indeed, with respect to two contracts, these are the only allegations on which Ezoic bases its claim of knowledge.  *See* ACC ¶¶ 54–55 (24 Minutes), 68–69 (Muhanfeed).  Such allegations are insufficient to withstand a motion to dismiss.  *See Citizens United*, 882 F.3d at 384–85.

Second, Ezoic's slightly more specific allegations regarding Taboola's communications with Média Sur 7 and SwingxSwing fall short of alleging Taboola's actual knowledge of Ezoic's contracts with these entities.  Ezoic's premise is that these clients' additional communications with Taboola inherently bespeak Taboola's knowledge of their contractual relationships with Ezoic, to wit, that, to have such a relationship, the clients needed to agree to Ezoic's Terms of

Service.[10]  But even assuming this much was adequately pled, Taboola's knowledge that these clients had agreed to Ezoic's Terms of Service is not coextensive with its "actual knowledge" of the terms of the specific contracts at issue.  *See Wellington Shields & Co. LLC*, 2016 WL 5414979, at *4 (plaintiff must plead sufficient facts to establish "actual knowledge of the terms of the contract and of the contractual obligation that was allegedly breached").  There is substantial daylight between an awareness of the broad terms of a commercial relationship and awareness of the specific contractual terms of that relationship.  Ezoic does not allege facts sufficient to plead the latter.  *See Iqbal*, 556 U.S. at 678.

Third, Ezoic notes that its Terms of Service, including the form contract that it used for individual client agreements, were publicly available, making it possible for Taboola to access and absorb them.  That allegation, however, falls short of pleading Taboola's actual knowledge of the specific Ezoic-Client Agreements at issue.  Allegations that Taboola "should have known" or "could have known" of the contracts' terms by virtue of their accessibility do not adequately plead Taboola's knowledge.  *See AA Tube Testing*, 246 N.Y.S.2d at 248.  Notably absent, too, from Ezoic's pleading is any allegation that Taboola *knew* that the Terms of Service provided such a model contract that necessarily was utilized in Ezoic's contracts with the clients.  For this reason, too, this allegation fails to plead Taboola's knowledge of the limitations imposed on the

---

[10] For example, Ezoic points to a communication between Média Sur 7 and Ezoic about a threatening call received by Média Sur 7 from an account manager at Taboola.  *See* ACC ¶ 30. Ezoic, however, does not allege any detail as to the purpose of the call or the nature of the threat, let alone that any discussion was had of the terms of the Ezoic-Média Sur 7 Agreement.  Ezoic makes similar conclusory allegations with respect to the SwingxSwing relationship.  Based on alleged communications between SwingxSwing and Taboola in which SwingxSwing "informed Taboola that it wanted Taboola to 'get comfortable with integration with Ezoic,'" *id.* ¶ 38—to which Ezoic alleges, "upon information and belief, Taboola responded by threatening SwingxSwing with a lawsuit," *id.* ¶ 39—Ezoic concludes that SwingxSwing "discussed the material terms of the Ezoic-SwingxSwing Agreement with Taboola," *id.* ¶ 41.  As alleged, these communications are too speculative to support such claims of knowledge.

clients by their individual contracts. *See State St. Glob. Advisors Tr. Co.*, 2020 WL 71162, at *17.

Fourth, as an ostensible basis for alleging Taboola's knowledge, Ezoic asks the Court to infer that Taboola "monitored the websites of Ezoic's clients" from the fact that Taboola allegedly threatened Média Sur 7 and SwingxSwing with legal action if they did not stop running Ezoic's tool. *See* ACC ¶¶ 30, 37. This argument suffers from the same failings noted above. The allegation that Taboola appreciated that some kind of relationship existed between Ezoic and its clients is not tantamount to alleging that it appreciated the relevant metes and bounds of the agreements that bound the clients in their dealings with Ezoic.

Fifth, Ezoic cites its CEO's communications with Taboola as revealing Taboola's actual knowledge of the terms of the Ezoic-Client Agreements. But the amended counterclaims cite these communications as evidence of Taboola's actual knowledge of the *Ezoic-Google Agreements*, not the Ezoic-Client Agreements. ACC ¶ 59. Ezoic merely alleges that Lafleur "emailed Taboola's Publisher Optimization Manager and Business Development & Publisher Sales Manager regarding Ezoic's inability to partner with Taboola because of Taboola's advertising practices," which were incompatible with Google's strict standards, and "directed Taboola to an article with additional information about Ezoic and Google's partnership." *Id.* This brief exchange does not supply a basis on which to infer Taboola's actual knowledge of the separate Ezoic-Client Agreements. *See Wellington Shields & Co. LLC*, 2016 WL 5414979, at *4.

Sixth and finally, with respect specifically to its claim that Taboola tortiously interfered with its agreement with Popdust, Ezoic argues that its original counterclaims, which it brought before Taboola allegedly interfered with that client, support its claim of actual knowledge. *See*

ACC ¶ 80.  But those original counterclaims do not relate to Popdust, as to which no claim was then made.  Ezoic's claim that its counterclaim gave Taboola actual knowledge of the terms of the Popdust-Ezoic Agreement is unduly speculative—it assumes that Taboola read the original counterclaims, accepted Ezoic's allegations therein about other contracts as truthful, and knew that the specific allegations therein about other contracts carried over equally to Popdust.  That alleged chain of inferences does adequately plead the required actual knowledge.  *See Roche Diagnostics*, 992 F. Supp. 2d at 221.

Ezoic's first counterclaim thus fails to allege that Taboola had actual knowledge of the terms of Ezoic's client contracts with which Taboola is alleged to have interfered.  Because Ezoic has failed to adequately plead two of the five elements of a prima facie case of tortious interference with the Ezoic-Client Agreements—breach and actual knowledge—the Court accepts the Report's recommendation, and dismisses Ezoic's first counterclaim.

### B.    Counterclaim for Tortious Interference with the Ezoic-Google Agreements

Ezoic alleges that Taboola tortiously interfered with Ezoic's agreement with Google, causing Ezoic to involuntarily breach its contracts with Google and exposing Ezoic to a potential claim of breach by Google for more than $200,000.  ACC ¶¶ 6–7.  Specifically, Ezoic alleges that it "performed its obligations under the Ezoic[-]Google Agreements by providing its Clients with a Google-certified advertising application and following-up with its Clients to ensure that they were complying with Google's advertising policies."  ACC ¶ 98.  It contends that Taboola had "actual knowledge" of these contracts, *id.* ¶ 99, but nevertheless "directly and intentionally caused Ezoic to breach the Ezoic-Google Agreements" by causing Ezoic's Clients to violate Google's Adsense Advertising Policies.  Ezoic alleges that, but for Taboola's tortious acts, it would not have breached the Ezoic-Google Agreements.  *Id.* ¶¶ 100–01.

Taboola counters that it cannot be held liable "for consequences so far removed from Taboola's limited role in promoting its Widget." Report at 8. It argues that Ezoic has not adequately alleged facts showing that (a) Taboola had actual, as opposed to constructive, knowledge of the terms of Ezoic's agreements with Google, MTD at 11; (b) Ezoic actually breached the Google Agreement, *id.* at 14–15; (c) Taboola's actions targeted the Ezoic-Google Agreements directly, *id.* at 20–21; or that (d) Ezoic has suffered damages from its breach of its agreements with Google, *id.* at 23–25.

The Court need only consider two of these arguments to find this counterclaim deficiently pled.

### 1.    Actual Knowledge

First, Ezoic fails to allege Taboola's actual knowledge of Ezoic's contract with Google. The facts that Ezoic musters in support of this element are limited to (1) Taboola had been on actual notice that Ezoic was a Google Adsense partner, *see* ACC ¶ 59, and (2) "the responsibilities of [sic] that come with that partnership are well known in the online advertising industry," *id.* ¶ 60; *see also id.* ¶ 99.

These allegations, even if taken as true, fall well short of what is required for a plaintiff to plead actual knowledge of the terms of an alleged agreement between a defendant and a third party. *See State St. Glob. Advisors Tr. Co.*, 2020 WL 71162, at *17; *Wellington Shields & Co. LLC*, 2016 WL 5414979, at *4. Even if Ezoic's contract with Google itself had been posted on Ezoic's website—and Ezoic has not so pled—this would supply a basis to infer no more than Taboola's constructive knowledge, which is insufficient. *See Roche Diagnostics*, 992 F. Supp. 2d at 221 (publication of a contract in quarterly SEC filing only provided "constructive knowledge [and was] inadequate to demonstrate [actual] knowledge for purposes of tortious interference"). Ezoic's reliance on standard industry practice as a basis for inferring actual knowledge fares no

better, for "industry practice is not sufficient to show actual knowledge." *Wellington Shields &
Co. LLC*, 2016 WL 5414979, at *4.  Put differently, Ezoic cannot assume that because Taboola
may have understood the terms of others' agreements with Google, it had actual knowledge of
the terms negotiated between Ezoic and Google.

### 2.    Damages

Separately, Ezoic has failed to allege that it has suffered any damages as a result of its
Clients' alleged breaches of Google's policies.  Ezoic has not alleged that it has had to pay any
fines to Google.  It alleges only that a single client, non-party 24 Minutes, was fined for violating
Google's policies.  ACC ¶ 49.  Ezoic's only allegation as to damages that *it* may experience
entails a chain of speculative inferences.  Ezoic posits that, if 24 Minutes prevails in a litigation
against Google in Israeli court, Google "may" later demand indemnification or reimbursement
from Ezoic, and may ultimately prevail in that endeavor.  ACC ¶ 53.  This set of conjectures is
inadequate to support the damages element of a tortious interference claim.  *Kirch*, 449 F.3d
at 401.  This failing supplies an independent basis to dismiss Ezoic's second counterclaim.

### CONCLUSION

For the foregoing reasons, the Court accepts the Report's recommendation to dismiss
Ezoic's two counterclaims.  The Court accordingly grants Taboola's motion to dismiss.  This
case will now proceed to discovery, which will be supervised by Judge Fox pursuant to the
Court's previous order of reference.  Dkt. 50.

The Clerk of Court is respectfully directed to terminate the motion pending at docket 55.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: April 17, 2020
New York, New York