UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

TABOOLA, INC.,

                              Plaintiff,

                    -v-

EZOIC INC. and DWAYNE LAFLEUR,

                              Defendants.

---

17 Civ. 9909 (PAE) (KNF)

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

Plaintiff Taboola Inc. ("Taboola") brings this action for damages and injunctive relief against defendants Ezoic Inc. and its CEO Dwayne Lafleur (together, "Ezoic"), alleging breach of contract as well as tortious interference with contracts that Taboola entered into with internet website providers. Dkt. 74 ("Second Amended Complaint" or "SAC"). Taboola's initial Complaint and First Amended Complaint ("FAC") contained allegations along these lines as to four internet website providers: Julio Garcia Network ("JGN"), Swing by Swing Golf, Inc. ("SwingxSwing"), Precision Creations, LLC ("Precision Creations") and TechSoft IT Solutions ("TechSoft"). Ezoic moved to dismiss the FAC, but that motion was denied. Taboola then filed the SAC, which is almost identical to the FAC, save that it adds allegations of tortious interference as to four more website providers: Asian Hobbyist ("Asian Hobbyist"), Popdust, Inc. ("Popdust"), Productions Hard Line, Inc. ("PHL"), and Lake and McHenry County Scanner ("Lake & McHenry"). Pending now is Ezoic's motion to dismiss the SAC under Federal Rule of Civil Procedure 12(b)(6). For largely the same reasons that the Court denied Ezoic's motion to dismiss the FAC, it denies this motion.

## I. Background[1]

### A. The Parties

#### 1. Taboola

Taboola is a provider of targeted digital advertising technology. SAC ¶ 12. It claims that its content-recommendation technology, or "Widget," "reaches more than one billion internet users and offers more than 360 billion recommendations each month." *Id.* Taboola enters into agreements with internet publishers, such as CBS, USA Today, and The Weather Channel, to serve as the exclusive provider of content recommendations on the websites and digital properties that the publisher owns or operates. *Id.* ¶ 13. Specifically, Taboola provides publishers with the code for its Widget, which recommends sponsored articles and advertisements that are custom-targeted to the website's visitors. *Id.* ¶ 14. This content, which Taboola funnels toward website visitors, may be provided by sponsoring advertisers, third-party publishers, or the website itself. *Id.* When a visitor clicks on a Taboola recommendation, she is directed to the website of the (third) party that paid for the distribution of the content. *Id.* ¶ 15. That party pays Taboola based on the number of times that visitors engage with, *i.e.*, click on, the sponsored content. *Id.* Taboola shares a percentage of these revenues with the publisher whose website prompted the visitor to engage with the promoted content. *Id.*

JGN, SwingxSwing, Precision Creations, TechSoft, Asian Hobbyist, Popdust, PHL, and Lake & McHenry (collectively, the "Publishers") are websites with which Taboola has done business pursuant to written contracts. These contracts require the publisher to display Taboola's technology-recommended content on the publishers' website during the contractual term.

---

[1] The Court draws its account of the underlying facts primarily from the SAC. *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010). In resolving those motions, the Court assumes all well-pled facts to be true and draws all reasonable inferences in favor of plaintiff. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

*Id.* ¶ 17.  The terms of the agreements between the publishers and Taboola are "substantially identical" to the terms of Ezoic's contract with Taboola, and to the "Publisher Terms and Conditions" that have been listed on Taboola's website, and which Taboola states have been available on its website, throughout the timeframes at issue here.  *Id.* ¶ 18.

### 2.    Ezoic

Ezoic is a "creator and provider of artificial intelligence applications for website owners, brands, publishers, and bloggers (its 'Clients') to improve their websites' revenue by optimizing visitor experiences."  Dkt. 68 ("Counterclaims Opinion") at 3.  Unlike Taboola, Ezoic is a Google-Certified Publishing Partner and a Google Adsense Online-Certified Partner.  *Id.*  To receive these certifications, Ezoic participated in Google's certified partner programs and consented to Google's Certified Publishing Partner Terms and Conditions, the Google Services Agreement, and the Google Adsense Online Certified Partner Program Agreement.  *Id.*

### B.    First Amended Complaint

On December 19, 2017, Taboola filed the initial complaint in this action, which was originally assigned to Judge Sweet.  Dkt. 1.  On May 7, 2018, Taboola filed the FAC.  Dkt. 26.  In it, Taboola alleged that Ezoic, in addition to breaching its own contract with Taboola, advised, encouraged, and instructed a number of Taboola's Publishers to breach their contracts with Taboola by removing Taboola's content-recommendation technology from their websites, despite the fact that Ezoic knew that such a removal would breach the Publishers' contractual obligations with Taboola.  *Id.* ¶ 22.

### 1.    Four Initial Publisher Allegations

On June 1, 2010, TechSoft entered into a publisher agreement with Taboola, which did not expire until June 2018.  FAC ¶¶ 67, 71; SAC ¶¶ 67, 71.  On April 23, 2014, SwingxSwing entered into a publisher agreement with Taboola, which did not expire until April 23, 2018.

FAC ¶¶ 37, 41; SAC ¶¶ 37, 41. On January 1, 2015, Precision Creations entered into a publisher agreement with Taboola, which did not expire until January 1, 2019. FAC ¶¶ 55, 58; SAC ¶¶ 55, 58. On June 7, 2016, JGN entered into a publisher agreement with Taboola, which did not expire until June 2018 at the earliest. FAC ¶¶ 23, 27–28; SAC ¶¶ 23, 27–28.

The material terms of these Publisher Agreements stated that: (1) the Publishers would display Taboola's content-recommendation technology on their respective websites throughout the contractual term; and (2) Taboola and the publishers would share, pursuant to a contractual formula, the revenues that Taboola received from the websites to which viewers would be redirected after clicking on a recommendation on the Publishers' websites. FAC ¶¶ 24, 38, 56, 69; SAC ¶¶ 24, 38, 56, 69. During the terms of each agreement, each Publisher was required to display Taboola's content-recommendation technology on its website. FAC ¶¶ 24, 39, 57, 69; SAC ¶¶ 24, 39, 57, 69. And during the term of the agreements with TechSoft, SwingxSwing, and JGN, those Publishers were prohibited from using content-recommendation technologies belonging to Taboola's competitors. *Id.* ¶¶ 64, 40, 70.

The FAC alleged that the Publishers discussed the material terms of their Taboola agreements with Ezoic, including the requirement that the Publishers display Taboola's content-recommendation technology on their websites throughout the contractual term. FAC ¶¶ 29, 43, 61, 73; SAC ¶¶ 29, 43, 61, 73. Nevertheless, Ezoic suggested to the Publishers that they stop using Taboola's platform; in response, the Publishers did so. FAC ¶ 31; SAC ¶ 31. The FAC specifically alleges that Ezoic encouraged these breaches despite actually knowing of the Publishers' agreements with Taboola and that the actions Ezoic encouraged would put the Publishers in breach of their contracts with Taboola. FAC ¶¶ 33–36, 53, 65, 76; SAC ¶¶ 33–36,

53, 65, 76. Therefore, the FAC alleged, Ezoic intentionally caused the Publishers to breach their agreements with Taboola. *Id.*

The FAC also alleged that, on May 25, 2017, Taboola sent a letter to Ezoic, "demanding that it cease and desist from interfering with [Taboola's] business relationships." FAC ¶ 143; SAC ¶ 143. That letter "specifically stated that JGN had an ongoing written contract with Taboola, in effect until June 2018, that required JGN (1) to display Taboola's Content Discovery Platform on JGN's websites; and (2) not to use content recommendation technologies belonging to Taboola's competitors." *Id.* On July 7, 2017, Taboola sent a similar cease-and-desist letter regarding Ezoic's interference with SwingxSwing. FAC ¶¶ 145, 147 ("These cease and desist letters expressly informed Ezoic that Plaintiff's publisher agreements required its publishers to display Plaintiff's Content Discovery Platform throughout the contractual term and prohibited the publishers from using competing advertising or content recommendation technology."); SAC ¶¶ 145, 147 (same). But, despite having received the cease-and-desist letters, Ezoic continued to tortiously interfere with both contracts. FAC ¶¶ 144, 148; SAC ¶¶ 144, 148.

## 2. Taboola's Contract with Ezoic

The FAC also alleged that in August 2014, Taboola entered into a contract with Ezoic which was in effect until August 2017. FAC ¶¶ 85, 90; SAC ¶¶ 128, 133. The material terms of the agreement, which was substantially identical to Taboola's other Publisher Agreements, were that Ezoic would display Taboola's content-recommendation technology on its website throughout the contractual term and that the parties would share the revenues that Taboola received from third-party websites to which viewers were redirected after clicking on a recommendation on Ezoic's websites, pursuant to a specific contractual formula. FAC ¶ 87; SAC ¶ 130. During the term of the agreements, Ezoic was required to display Taboola's content-

recommendation technology on its website and could not use content from Taboola's competitors. FAC ¶¶ 88–89; SAC ¶¶ 131–32. The FAC also alleged that Ezoic was aware of the terms in its agreements, which were standard terms in Taboola's Publisher Agreements. FAC ¶ 92; SAC ¶ 135.

The FAC alleged that Ezoic breached its contract with Taboola in October 2014 by failing to display Taboola's Content Discovery Platform on Ezoic's website during the full contractual term. FAC ¶ 93; SAC ¶ 136. This breach caused Taboola to lose advertising revenue. *Id.* The FAC also alleged that Ezoic breached the non-disparagement clause in its contract with Taboola, which prohibits Ezoic from "any action or practice that disparages or devalues Plaintiff, the Widget, the Taboola Sponsored Content, or the reliability, reputation or goodwill of any of them," because Ezoic disparaged Taboola's products to the Publishers. FAC ¶ 94; SAC ¶ 137. According to the FAC, Ezoic told these Publishers that Taboola's technology was inferior to its competitors and advised them to stop using Taboola's technology. *Id.* Finally, the FAC pled, Ezoic breached the contract's non-modification clause when it configured some of Taboola's Publishers' websites not to display Taboola's content-recommendation technology. FAC ¶ 98; SAC ¶ 141.

### C. Motion to Dismiss the First Amended Complaint

On June 8, 2019, defendants moved to dismiss the FAC. Dkt 27. On February 6, 2019, Judge Sweet issued a decision denying that motion. Dkt. 34; *Taboola, Inc. v. Ezoic Inc.*, No. 17 Civ. 9909, 2019 WL 465003, at *1 (S.D.N.Y. Feb. 6, 2019) ("Sweet Opinion"). He held that, under the forum-selection clause in the contract between Taboola and Ezoic, New York law applied to both the breach of contract and tortious interference claims, and that under such law, the FAC plausibly pled both sets of claims.

### 1. Tortious Interference Claim

Judge Sweet found that, as to the four allegations of tortious interference with JGN, SwingxSwing, Precision Creations, and TechSoft, the FAC had stated a claim. *See id.* at *9 ("To plead a claim for tortious interference under New York law, a plaintiff 'must show (1) the existence of a valid contract between plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional procuring of the breach; and (4) damages.'" (quoting *White Plains Coat & Apron Co. v. Cintas Corp.*, 460 F.3d 281, 285 (2d Cir. 2006))).

First, the FAC adequately alleged the existence of the four Publisher Agreements, even though the agreements were not attached to the FAC and even though the FAC had failed to quote "the actual terms of the contracts." *Id.* ("Under New York law, however, a plaintiff need only specifically plead the existence of a valid contract and provide some details about its terms and its breach to sustain a tortious interference with contract claim at the motion to dismiss stage." (cleaned up)). Specifically, Judge Sweet held that the FAC had adequately pled the existence of the agreements because it "plainly alleges the existence of written contracts with [the] four [original] publishers," and the "allegations include the dates that each of the four Publisher Agreements were executed and" the term that they lasted until expiration. *Id.* at *10. The FAC, he held, also alleged,

> the material terms of these contracts, namely: that (1) the Publishers would display Taboola's Content Recommendation Technology on their respective websites throughout the contractual term; and (2) Taboola and the Publishers would share the revenues that Taboola received from third-party websites to which viewers are redirected after clicking on a Recommendation on the Publishers' websites, calculated pursuant to a specified contractual formula.

*Id.* Judge Sweet concluded that "[a]t this stage of the litigation, such allegations are sufficient to plead the existence of valid, existing contract." *Id.*

Second, Judge Sweet found that the FAC had adequately alleged that Ezoic had actual knowledge of the Publisher Agreements and their material terms based on

> five ways in which Ezoic allegedly came to possess such actual knowledge: (1) the terms of their own agreement with Taboola, which is substantially similar to the terms of the Publisher Agreements; (2) the publicly available Publishers Terms and Conditions on Taboola's website, which mirror the terms of the Publisher Agreements; (3) the cease and desist letters sent by Plaintiff; (4) Ezoic's communications with the Publishers; and (5) Ezoic's own business dealings with Taboola and publicly available information, which indicate that Taboola only makes its Content Recommendation Technology available to websites that have an ongoing contract with Taboola requiring the website to display the Content Recommendation Technology.

*Id.* at *11 (citations omitted). "Considered together, these allegations are adequate to plead Ezoic's actual knowledge of the contract." *Id.* (citing *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 402 (2d Cir. 2006) (finding actual knowledge of contract adequately pled where plaintiff alleged that it "had a contract with [a specified third party], of which the Defendants were aware, concerning the design and implementation of [a project]")).

Third, Judge Sweet held that the FAC had adequately alleged that Ezoic had intentionally procured and caused breaches of the Publisher Agreements "by advising and instructing the Publishers to remove Taboola's Content Recommendation Technology from their websites . . . as well as by taking active measures to implement code in Ezoic's ad-testing platform that blocks Taboola's technology from appearing on the Publishers' websites." *Id.* And, he held, the FAC properly alleged that, but for Ezoic's tortious acts, the Publishers would not have breached the Publisher Agreements with Taboola. *Id.* In so finding, Judge Sweet pointed to examples pled in the FAC supporting its allegations that were "sufficient to 'nudge' its claim 'across the line from conceivable to plausible.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). Specifically, he noted, the FAC alleged that "Ezoic sent JGN an email explaining that it did not 'allow,' and had taken measures to block, Taboola's Content Recommendation Technology from appearing on JGN's websites,

and that Ezoic suggested that JGN replace Taboola with . . . a competitor of Taboola" *id.* (cleaned up); that "SwinxSwing breached its agreement with Taboola as a direct result of Ezoic's advice that SwingxSwing could increase its profits by using other advertising technologies," *id.*; that "Precision Creations informed [Taboola] that Ezoic implemented code that automatically removed Taboola's Content Recommendation Technology," *id.*; and that "[s]imilar allegations were made regarding Ezoic's interference with the TechSoft Agreement," *id.* And, the FAC alleged, "Ezoic was intentionally removing Taboola's technology from the Publishers' websites in an effort to coerce Taboola's customers to switch to . . . a direct competitor of Taboola with whom Ezoic has a partnership," by making statements to the Publishers "about the functionality of Taboola's technology [that] were baseless and false." *Id.* Judge Sweet found that these allegations, together with other pled facts, "support[ed] the notion that Ezoic has taken continuous, affirmative steps to prevent Taboola's Content Recommendation Technology from displaying on the Publishers' websites, without justification for doing so. At the motion to dismiss stage, this is enough to satisfy the third element of a tortious interference with contract claim." *Id.*

Finally, Judge Sweet held that the FAC adequately pled damages, as "[i]t is reasonable to infer based on these allegations that failure to display Taboola's Content Recommendation Technology would directly result in Taboola's loss of the advertising revenues that the technology, and the contracts licensing its used, were intended to generate." *Id.* at *12.

### 2. Breach of Contract Claim

Judge Sweet also held that the FAC had properly alleged that Ezoic had breached its own contract with Taboola. *Id.* at *13 ("To state a breach of contract claim under New York law, the plaintiff must allege: '(1) the existence of an agreement; (2) adequate performance of the

contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages.'" (quoting *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004))).

Judge Sweet explained that the FAC pled "several specific allegations to support the existence of a contract between Taboola and Ezoic," including that Taboola and Ezoic "entered into an enforceable written contract that was executed on August 12, 2014 (the 'Ezoic Agreement') by Lafleur both individually and on behalf of Ezoic." *Id.* The FAC pled that the material terms of the Ezoic Agreement were: "(1) Ezoic will display Taboola's Content Recommendation Technology on its website, internetslang.com, throughout the contractual term; and (2) Taboola and Ezoic will share the revenues that Taboola receives from third party websites to which viewers are redirected after clicking on a Recommendation on Ezoic's website, pursuant to a specified contractual formula." *Id.* The Ezoic Agreement also prohibited Ezoic "from modifying or interfering with Taboola's technology or from disparaging Taboola." *Id.* And the FAC alleged that Taboola had performed under the Ezoic Agreement "by, among other things, providing and servicing the Content Recommendation Technology on the Publishers' websites and sharing advertising revenues with the Publishers as per the contractually specified formula in the Ezoic Agreement." *Id.* at *14.

Judge Sweet thus concluded the FAC pled "factual content that allows the court to draw the reasonable inference" that Ezoic was liable for breaching its contract with Taboola. *Id.* (quoting *Iqbal*, 556 U.S. at 678); *see id.* (listing the three obligations in the contract that the FAC plausibly alleged that Ezoic had breached: "(1) Ezoic display Taboola's Content Recommendation Technology on their website during the contractual period of October 2014-August 2017; (2) Ezoic refrain from engaging in any action or practice that disparages or

devalues [Taboola] . . . (the Non-Disparagement Clause); and (3) Defendants refrain from modifying, changing, editing, amending, truncating, altering, bypassing or reordering any aspect of Taboola's Content Recommendation Technology (the No Modification Clause)" (cleaned up)). Finally, Judge Sweet held that the FAC properly alleged damages. *Id.* at \*15.

### D. Counterclaims

On March 13, 2019, defendants filed counterclaims against Taboola, alleging that it had tortiously interfered with Ezoic's contracts with a number of its clients and with Google. Dkt. 38. On April 8, 2019, this case was reassigned to this Court. On May 3, 2019, Taboola moved to dismiss the counterclaims. Dkt. 45. On May 6, 2019, that motion was referred to Magistrate Judge Kevin N. Fox. Dkt. 50. On June 7, 2019, the defendants filed an amended counterclaim, Dkt. 54, which Taboola again moved to dismiss, Dkt. 55. On February 21, 2020, Judge Fox issued a Report and Recommendation recommending dismissal of Ezoic's counterclaims in their entirety. Dkt. 63. Over Ezoic's objections, on April 17, 2020, this Court accepted the Report's recommendation and dismissed the counterclaims. *See* Counterclaims Opinion. On July 15, 2020, discovery began. Dkt. 71. The same day, the case was referred to mediation. Dkt. 72.

### E. Second Amended Complaint.

On August 21, 2020, Taboola filed the SAC. Dkt. 74. In addition to repleading the allegations in the FAC, it added parallel allegations of tortious interference with respect to four additional Publishers: Asian Hobbyist, Popdust, PHL, and Lake & McHenry. The SAC also modified the amount of damages claimed, *id.* ¶ 157, and removed the language "upon information and belief" from the FAC's allegation that Ezoic had refused to comply with the cease-and-desist letters, *id.* ¶ 148.

11

### 1. Four Additional Publishers

#### a. *Asian Hobbyist*

The SAC alleges that Taboola entered into a publisher agreement with Asian Hobbyist effective November 6, 2017, which did not expire until November 6, 2020 at the earliest. *Id.* ¶¶ 78, 82. The central terms of that agreement were that Asian Hobbyist would display Taboola's Content Discovery Platform on its website throughout the agreement's term, and, in return Taboola and Asian Hobbyist would share the revenues Taboola received from the third-party websites to which viewers were redirected after clicking on the Taboola recommendation on Asian Hobbyist's websites. *Id.* ¶ 79. During the agreement's term, Asian Hobbyist could not use content-recommendation technologies belonging to Taboola's competitors. *Id.* ¶ 81. The SAC further alleges that Asian Hobbyist discussed the material terms of its Taboola contract with Ezoic, including the requirement that the publisher display Taboola's Content Discovery Platform throughout the contractual term, *id.* ¶ 84, giving Ezoic actual knowledge of Taboola's agreement with Asian Hobbyist, *id.* ¶ 88. Nevertheless, the SAC pleads, Ezoic falsely stated to Asian Hobbyist that the video advertisements provided on Taboola's platform violated Google's advertising policies and asked that the advertisements be removed, although such removal would breach Asian Hobbyist's agreement with Taboola. *Id.* ¶¶ 85–86. The SAC alleges that the purpose of Ezoic's false representation was to disrupt Taboola's relationship with Asian Hobbyist, and that Asian Hobbyist's resulting removal of the advertisements on or around June 20, 2019 directly resulted from Ezoic's intentional interference with the contract. *Id.* ¶¶ 87, 89.

#### b. *Popdust*

The SAC alleges that Taboola entered into a Publisher Agreement with Popdust on March 14, 2019, which did not expire until May 19, 2019. SAC ¶¶ 90, 94. The central terms of

that agreement were that Popdust would display Taboola's Content Discovery Platform on its website throughout the agreement's term, and, in return, Taboola and Popdust would share the revenues Taboola received from the third-party websites to which viewers were redirected after clicking on the Taboola Recommendation. *Id.* ¶¶ 91, 92. During the agreement's term, Popdust could not use content-recommendation technologies belonging to Taboola's competitors. *Id.* ¶ 93. The SAC further alleges that Popdust discussed the material terms of its Taboola contract with Ezoic, including the requirement that Popdust display Taboola's Content Discovery Platform on its websites throughout the contractual term, *id.* ¶ 96, giving Ezoic actual knowledge of Popdust's Agreement with Taboola, *id.* ¶ 102. Nevertheless, the SAC alleges, Ezoic falsely stated to Popdust that "Google had disabled is advertisements of Popdust's website because Taboola's 'infinite scroll' feature violated Google policies and that the only solution was to remove Taboola's" platform from Popdust's website. *Id.* ¶¶ 97, 98. The SAC alleges that Ezoic knew such removal would breach Popdust's agreement with Taboola, and that the purpose of its false representation to Popdust was to induce Popdust to breach the Taboola contract and use one of Taboola's competitors. *Id.* ¶¶ 103, 104. As a direct result of this interference, Popdust breached its contract with Taboola by removing Taboola's platform from its website on May 7, 2019. *Id.* ¶¶ 100, 104.

*c.*      *PHL*

The SAC alleges that Taboola entered into a Publisher Agreement with PHL on June 12, 2019, which will not expire until June 12, 2021 at the earliest. *Id.* ¶¶ 105, 109. The central terms of that agreement were that PHL would display Taboola's Content Discovery Platform on its website throughout the agreement's term, and, in return, Taboola and PHL would share the revenues that Taboola received from the third-party websites to which viewers were redirected

after clicking on the Taboola Recommendation on PHL's websites. *Id.* ¶¶ 106–07. During the agreement's term, PHL could not use content-recommendation technologies belonging to Taboola's competitors. *Id.* ¶ 108. The SAC also alleges that PHL discussed the material terms of its Taboola contract with Ezoic, giving Ezoic actual knowledge of Taboola's agreement with PHL, including that PHL had to display Taboola's Content Discovery Platform throughout the contractual term. *Id.* ¶¶ 111, 115. The SAC alleges that Ezoic's software had been deliberately configured to block Taboola's software. *Id.* ¶ 112. As a result, on June 19, 2019, PHL told Taboola that the software it was using from Ezoic conflicted with Taboola's platform, and that PHL thus intended to stop using Taboola. *Id.* It further alleges that PHL thereafter removed Taboola's Content Discovery Platform from its website, in breach of the contract, as a direct result of Ezoic's intentional interference with the contract by "preventing Taboola's Content Discovery Platform from displaying on PHL's website." *Id.* ¶¶ 113, 116.

d.      *Lake & McHenry*

The SAC next alleges that Taboola entered into a publisher agreement with Lake & McHenry on September 25, 2018, which did not expire until September 25, 2020. SAC ¶¶ 117, 121. The central terms of that agreement were that Lake & McHenry would display Taboola's Content Discovery Platform on its website throughout the agreement's term, and, in return, Taboola and Lake & McHenry would share the revenues Taboola received from the third-party websites to which viewers were redirected after clicking on the Taboola recommendation. *Id.* ¶¶ 118–19. During the agreement's term, Lake & McHenry could not use content-recommendation technologies belonging to Taboola's competitors. *Id.* ¶ 120. The SAC further alleges that Lake & McHenry discussed the material terms of its Taboola contract with Ezoic, giving Ezoic actual knowledge of Taboola's agreement with Lake & McHenry, including that

Lake & McHenry had to display Taboola's Content Discovery Platform throughout the contractual term. *Id.* ¶¶ 123, 126. The SAC alleges that Ezoic's software had been deliberately configured to block Taboola's software. *Id.* And, it alleges, on June 20, 2019, Lake & McHenry told Taboola that the software that it was using from Ezoic conflicted with Taboola's platform, making Lake & McHenry unable to display Taboola's platform. *Id.* ¶ 123. Therefore, the SAC alleges, as a direct result of Ezoic's intentional interference with the contract, which "prevent[ed] Taboola's Content Discovery Platform from displaying on Lake & McHenry's website," Lake & McHenry removed Taboola's Content Discovery Platform from its website in breach of its agreement with Taboola. *Id.* ¶ 127.

### 2. Motion to Dismiss the SAC

On September 17, 2020, Ezoic moved to dismiss the SAC, Dkt. 77, and filed a supporting memorandum of law, Dkt. 78 ("Def. Mem."). On October 1, 2020, Taboola filed an opposition. Dkt. 81 ("Pl. Opp'n"). On October 8, 2020, Ezoic filed a reply. Dkt. 83 ("Reply"). Mediation proved unsuccessful and, on February 1, 2021, this Court extended discovery until April 1, 2021. Dkt. 110. The Court now addresses Ezoic's motion to dismiss the SAC.

## II. Legal Standards Applicable to the Motion to Dismiss the SAC

### A. Motions to Dismiss Under Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. When resolving a motion to

dismiss, the court must accept as true all well-pled factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Steginsky v. Xcelera, Inc.*, 741 F.3d 365, 368 (2d Cir. 2014). That tenet, however, "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. Pleadings that offer only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

Judge Sweet's earlier decision denying the motion to dismiss the FAC found New York law to apply to both the tortious interference and breach of contract claims. Sweet Opinion at *8. Neither party argues otherwise on this motion. Accordingly, the Court will apply New York law. *See Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009).

### B. Tortious Interference: Elements and Choice of Law

Under New York law, the elements of tortious interference with contract are: "(1) the existence of a valid contract between plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional procuring of the breach; and (4) damages." *White Plains Coat & Apron Co.*, 460 F.3d at 285. "In addition, the plaintiff must assert, with respect to each defendant, that the defendant's actions were the 'but for' cause of the alleged breach—in other words, that there would not have been a breach but for the activities of the defendant." *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 405 (S.D.N.Y. 2009) (citing *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 828 (2d Cir. 1990)), *aff'd*, 387 F. App'x 72 (2d Cir. 2010); *see also White Plains Coat & Apron Co.*, 460 F.3d at 285 ("[W]hen there is knowledge of a contract, and a competitor takes an active part in persuading a party to the contract to breach it by offering better terms or other incentives, there is an unjustifiable interference with the contract." (quoting *State Enters., Inc. v. Southridge Co-op. Section 1, Inc.*, 18 A.D.2d 226, 227–28 (1st Dep't 1963))).

### 1.     Existence of a Valid Contract

"A central requirement for [claiming tortious interference] under New York law is the existence of a valid, enforceable contract between the plaintiff and a third party."  *Scutti Enters., LLC v. Park Place Entm't Corp.*, 322 F.3d 211, 215 (2d Cir. 2003).  Because a properly pled tortious interference complaint also requires a showing of breach, contracts terminable at will generally cannot provide the basis for such a claim.  *See AIM Int'l Trading, LLC v. Valcucine S.p.A.*, No. 02 Civ. 1363 (PKL), 2003 WL 21203503, at \*5 (S.D.N.Y. May 22, 2003) (citing *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 193–94 (1980)); *see also Watts v. Jackson Hewitt Tax Serv. Inc.*, 675 F. Supp. 2d 274, 281 (E.D.N.Y. 2009) (citing *Snyder v. Sony Music Entm't Inc.*, 252 A.D.2d 294, 300 (1st Dep't 1999) ("[A]greements that are terminable at will are classified as only prospective contractual relations, and thus cannot support a claim for tortious interference with existing contracts.")); *Orange Cnty. Choppers, Inc. v. Olaes Enters., Inc.*, 497 F. Supp. 2d 541, 562 (S.D.N.Y. 2007) (dismissing tortious interference claim where allegations left open possibility that contract was terminable at will).

Where the means employed to induce the breach are "wrongful," however, the valid-contract prong of a tortious interference claim may be satisfied by an at-will contract.  *See Guard-Life Corp.*, 50 N.Y.2d at 194 ("Where contracts terminable at will have been involved, we have upheld complaints and recoveries in actions seeking damages for interference when the alleged means employed by the one interfering were wrongful as consisting of fraudulent representations, or threats[,] or as in violation of a duty of fidelity owed to the plaintiff by the defendant by reason of a relation of confidence existing between them." (internal citations omitted)).

### 2. Actual Breach of the Contract

To make out the second element of a tortious interference claim, the plaintiff must plead sufficient facts to establish an actual breach of the agreement. "The Second Circuit has adopted a formalistic approach to determining whether a plaintiff has properly alleged breach of a contract in a tortious interference claim." *RSM Prod. Corp.*, 643 F. Supp. 2d at 409 (citing *Kirch*, 449 F.3d at 402). The Circuit has applied this approach to affirm the dismissal of a tortious interference with contract claim on the basis that "plaintiffs fail[ed] to allege . . . actual breach" of a contract when the complaint alleged that the contracting party had "walked away" from a project, because such statements do "not amount to an allegation that [the contracting party] violated the terms of a contract." *Kirch*, 449 F.3d at 402.

### 3. Actual Knowledge of the Contract

To satisfy the third element, the plaintiff must plead facts showing not only that the defendant had knowledge of the existence of a contract, but also that it had "actual knowledge of the terms of the contract and of the contractual obligation that was allegedly breached." *See Wellington Shields & Co. v. Breakwater Inv. Mgmt. LLC*, No. 14 Civ. 7529 (RJS), 2016 WL 5414979, at *4 (S.D.N.Y. Mar. 18, 2016) (citing *Roche Diagnostics GmbH v. Enzo Biochem, Inc.*, 992 F. Supp. 2d 213, 221 (S.D.N.Y. 2013)); *see also AA Tube Testing Co. v. Sohne*, 20 A.D.2d 639, 639 (2d Dep't 1964) ("As an essential element of [tortious interference], the plaintiff must allege that the defendants had *actual* knowledge; an allegation that they 'should have known' of the existence of the contract is insufficient." (emphasis in original)).

A party claiming tortious interference need not show that the interfering party had "perfect knowledge of the contract." *Reach Music Pub., Inc. v. Warner/Chappell Music, Inc.*, No. 09 Civ. 5580 (KBF), 2014 WL 5861984, at *10 (S.D.N.Y. Nov. 10, 2014). But "[t]he plaintiff must [plead] specific allegations of the defendant's knowledge" of the contract, *Medtech*

*Prods. Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 813 (S.D.N.Y. 2008), including "some knowledge of the terms and conditions of the allegedly-interfered-with contract," *State St. Glob. Advisors Tr. Co. v. Visbal*, No. 19 Civ. 1719 (GWH), 2020 WL 71162, at *17 (S.D.N.Y. Jan. 3, 2020); *see also Wellington Shields & Co.*, 2016 WL 5414979, at *4 (plaintiff must plead sufficient facts to establish "actual knowledge of the terms of the contract and of the contractual obligation that was allegedly breached"); *Reach Music Pub., Inc.*, 2014 WL 5861984, at *10 ("Even though knowledge of the contract need not be perfect, [defendant] must have knowledge of the [relevant term] in order to be liable for helping [the third party] violate that particular contractual provision.").

Such specific allegations may not consist of "conclusory assertion[s] of knowledge," *see Medtech Prods.*, 596 F. Supp. 2d at 813, or pleadings based solely on "information and belief," *see Citizens United v. Schneiderman*, 882 F.3d 374, 384–85 (2d Cir. 2018) ("A litigant cannot merely plop 'upon information and belief' in front of a conclusory allegation and thereby render it non-conclusory. Those magic words will only make otherwise unsupported claims plausible when 'the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible.'" (quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010))). Claims that a defendant "should have known" about a contract or its terms are similarly insufficient, *see AA Tube Testing Co.*, 20 A.D.2d at 639, as are allegations based on the public availability of the underlying contract, *see Roche Diagnostics*, 992 F. Supp. 2d at 221 (fact that contract was published in quarterly filing "inadequate to demonstrate [actual] knowledge for purposes of tortious interference").

### C.	Breach of Contract

To establish a contract breach under New York law, a plaintiff must show: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Eternity Glob. Master Fund*, 375 F.3d at 177; *see also Palmetto Partners, L.P. v. AJW Qualified Partners, LLC*, 83 A.D.3d 804, 806 (2d Dep't 2011) (same). "Under New York law, written agreements are construed in accordance with the parties' intent and '[t]he best evidence of what parties to a written agreement intend is what they say in their writing.'" *Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 436 (2013) (quoting *Greenfield v. Philles Recs.*, 98 N.Y.2d 562, 569 (2002)).

## III.	Discussion

Ezoic's motion to dismiss the SAC is easily denied, on the basis of Judge Sweet's earlier decision denying Ezoic's motion to dismiss the FAC. That is because, as to the tortious interference claims, the SAC's allegations either replicate (as to the agreements with the four Publishers addressed in the FAC: JGN, SwingxSwing, Precision Creations, and TechSoft) or parallel (as to the agreements with the new Publishers: Asian Hobbyist, Popdust, PHL, and Lake & McHenry) those in the FAC. In denying Ezoic's motion to dismiss the FAC, Judge Sweet convincingly explained why the claims there withstand facial challenge, and Ezoic's present motion largely reprises the unsuccessful arguments it made in moving to dismiss the FAC. In any event, even if the Court had been inclined to view Ezoic's motion more favorably than had Judge Sweet, the Court would look askance at Ezoic's bid for a do-over based on this Court's assignment to this mater following Judge Sweet's death, as fidelity to the law of the case is especially important when a newly assigned judge "is asked to consider the ruling of a different judge." *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 94 (2d Cir.

2005). As this Court has recognized, "upon reassignment, 'the new judge is well advised to pay particular heed to the doctrine of "law of the case," and not to attempt a *de novo* review of . . . decisions made over a lengthy period by diligent and experienced judicial officers who have handled the case previously.'" *Waverly Props., LLC v. KMG Waverly*, No. 09 Civ. 3940 (PAE), 2011 WL 13322667, at *1 (S.D.N.Y. Dec. 19, 2011) (quoting *Peyser v. Searle Blatt & Co.*, No. 99 Civ. 10785 (GEL), 2004 WL 307300, at *1 (S.D.N.Y. Feb. 17, 2004)).

The Court here briefly explains why the tortious interference allegations as to the four newly pled agreements parallel those that Judge Sweet upheld as to the first four Publishers and adequately plead the elements of tortious interference. The Court then explains why the SAC's breach of contract claim similarly replicates that in the FAC, which Judge Sweet also upheld.

### A. Tortious Interference of the Four Additional Publishers

First, the SAC adequately alleges the existence of agreements between Taboola and the four additional publishers, Asian Hobbyist, Popdust, PHL, and Lake & McHenry. That is so even though the SAC does not attach or quote the agreements. *See* Def. Mem. at 9; Sweet Opinion at *9, 14 (rejecting argument that Taboola was required to attach agreements to FAC). As with the four original Publishers cited in the FAC, the SAC properly alleges the existence of written contracts with Asian Hobbyist, Popdust, PHL, and Lake & McHenry. *See* SAC ¶¶ 27, 41, 58, 71, 82, 94, 109, 121. Its allegations include the dates that each agreement was executed and each's expiration date. *Id.* The SAC also alleges the agreements' material terms, which mirror those with the first four Publishers: that (1) the Publishers would display Taboola's content-recommendation technology on their respective websites throughout the contractual term; and (2) Taboola and the Publishers would share the revenues that Taboola received from third-party websites to which viewers are redirected after clicking on a recommendation on the

Publishers' websites, calculated pursuant to a specified contractual formula. *See* SAC ¶¶ 24, 38, 56, 68, 79, 91, 106, 118, 130. The SAC's allegations that the Publisher Agreements were effective until their expiration dates refutes Ezoic's argument that the Publishers were at liberty to "walk away" from the agreements, such that there could be no breach. *See* Def. Mem. at 10; *see* SAC ¶¶ 27, 41, 58, 71, 82, 94, 109, 121. Thus, as Judge Sweet held in declining to dismiss the FAC, "[a]t this stage of the litigation, [the SAC's] allegations are sufficient to plead the existence of valid, existing contract." Sweet Opinion at *10.

Second, like the FAC, the SAC adequately alleges that Ezoic actually knew of the newly alleged Publisher Agreements and their material terms. Like the FAC, it cites,

> five ways in which Ezoic allegedly came to possess such actual knowledge: (1) the terms of their own agreement with Taboola, which is substantially similar to the terms of the Publisher Agreements; (2) the publicly available Publishers Terms and Conditions on Taboola's website, which mirror the terms of the Publisher Agreements; (3) the cease and desist letters sent by Plaintiff; (4) Ezoic's communications with the Publishers; and (5) Ezoic's own business dealings with Taboola and publicly available information, which indicate that Taboola only makes its Content Recommendation Technology available to websites that have an ongoing contract with Taboola requiring the website to display the Content Recommendation Technology.

*Id.* at 30–31; *see* SAC ¶¶ 18, 84, 88, 96, 102, 111, 115, 123, 126, 145, 147. "[C]onsidered together, these allegations are adequate to plead Ezoic's actual knowledge of the contract." *Id.*

Ezoic makes two new arguments why the SAC ostensibly fails to allege its actual knowledge of the material terms of the Publisher Agreements. Neither is persuasive. First, Ezoic argues that the material terms alleged by Taboola are not among the terms of service that Taboola references in the Amended Complaint and which appear on Taboola's website. *See* Def. Mem. at 7, 9–12. But Ezoic appears to have confused the terms and conditions that appear on Taboola's website that the SAC alleges apply to the Publisher Agreements with the unrelated terms and conditions on the website that govern visitors who access Taboola's content. *See* Pl.

Opp'n at 1; Reply at 3. Second, Ezoic argues that that the terms of service applicable to the Publisher Agreements on Taboola's public website were temporarily down at some point after the filing of the Amended Complaint. *See* Pl. Opp'n at 2; SAC ¶ 18; Dkt. 28 at 4–5 (Ezoic referencing terms in motion to dismiss FAC). Ezoic does not, however, explain why the temporary inaccessibility of these terms to visitors to Taboola's website makes implausible the SAC's allegation that Ezoic had notice of the terms.

Third, as in the FAC, the SAC adequately alleges that Ezoic intentionally caused breaches of the Publisher Agreements "by advising and instructing the Publishers to remove Taboola's Content Recommendation Technology from their websites . . . as well as by taking active measures to implement code in Ezoic's ad-testing platform that blocks Taboola's technology from appearing on the Publishers' websites." Sweet Opinion at *11; *see* SAC ¶¶ 85–86, 97–98, 112–13, 123, 127. The SAC pleads that, but for Ezoic's tortious acts, the Publishers would not have breached their agreements with Taboola. As with the first four Publishers, the specifics the SAC provides as to the added four Publishers "are sufficient to 'nudge' its claim 'across the line from conceivable to plausible.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). To this end, the SAC alleges that Ezoic falsely stated to Asian Hobbyist that the video advertisements on Taboola's platform violated Google's advertising policies, and that Ezoic asked Asian Hobbyist to remove the advertisements so as to disrupt Taboola's relationship with Asian Hobbyist. *See* SAC at ¶¶ 85–86. The SAC further alleges Ezoic falsely stated to Popdust that "Google had disabled is advertisements on Popdust's website because Taboola's 'infinite scroll' feature violated Google policies and that the only solution was to remove Taboola's" platform from Popdust's website, *id.* ¶¶ 97, 98, and that the purpose of this false representation was to induce Popdust to breach its contract with Taboola, *id.* ¶¶ 103, 104. As to PHL, the SAC alleges that

Ezoic's software had been deliberately configured to block Taboola's software, such that when PHL began using Ezoic's software, it could no longer also use Taboola's, and that Ezoic intentionally caused PHL to breach its contract with Taboola "by preventing Taboola's Content Discovery Platform from displaying on PHL's website." *Id.* ¶ 116. Similarly, the SAC alleges that Ezoic intentionally caused Lake & McHenry to breach its contract with Taboola by configuring its software to block Taboola's, such that when Lake & McHenry began using Ezoic's software, it could no longer also use Taboola's. *Id.* ¶¶ 123, 127. These allegations are "enough to satisfy the third element of a tortious interference with contract claim." Sweet Opinion at *11.

Finally, like the FAC, the SAC pleads the fourth tortious interference element: damages resulting from the breaches. *Id.* *12 ("It is reasonable to infer based on these allegations that failure to display Taboola's Content Recommendation Technology would directly result in Taboola's loss of the advertising revenues that the technology, and the contracts licensing its used, were intended to generate."). The SAC has therefore pled a plausible claim of tortious interference against Ezoic as to all eight Publisher Agreements.

### B.     Breach of Contract

The SAC has also adequately alleged that Ezoic breached its contract with Taboola. The SAC's breach of contract claim is not materially different from that in the FAC as upheld by Judge Sweet. *See Waverly Props., LLC*, 2011 WL 13322667, at *1; *see* Sweet Opinion at *13–15 (finding the FAC to plead with sufficient specificity the existence of a contract between Taboola and Ezoic; that Taboola had performed under its agreement with Ezoic; that Ezoic was liable for the contract breaches alleged; and damages). That the FAC did not attach a copy of the contract, Judge Sweet held, did not mean that the FAC had not stated a claim; so too with the

SAC. *See* Def. Mem. at 13. In moving to dismiss anew, Ezoic briefly and vaguely argues that its contract with Taboola was anticompetitive, so as to violate public policy. But that argument was equally available to Ezoic at the time of the FAC—it is not based on any new factual allegation. *See* Def. Mem. at 13; Fed. R. Civ. Pro. 12(g) ("[A] party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion."). In any event, it is conclusory, and unpersuasive. *See* Def. Mem. at 13 ("Indeed if the Court were to adopt the interpretation that the SAC proposes, it would render the alleged clauses highly anticompetitive and harmful to consumers, and thus contrary to law and public policy. Taboola has therefore failed to plead plausible breached."); *see also Twombly*, 550 U.S. at 555 (explaining that pleadings that are mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do").

The Court accordingly denies Ezoic's motion to dismiss the SAC's breach of contract claim.

## CONCLUSION

For the foregoing reasons, the Court denies Ezoic's motion to dismiss. The Clerk of Court is respectfully directed to terminate the motions pending at dockets 77, 80, and 100.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: May 21, 2021
    New York, New York